**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROD SOSA; GARY WHITTAKER;
RODNEY BYLSMA,
        *Plaintiffs-Appellants,*

v.

DIRECTV, INC.; HUGHES
ELECTRONICS CORPORATION;
GENERAL MOTORS CORPORATION;
YARMUTH WILSDON CALFO, PLLC;
GREER, HERZ & ADAMS, LLP;
STUMP, STOREY, CALLAHAN &
DIETRICH, PA; DIRECTV END
USER DEVELOPMENT GROUP;
DIRECTV END USER RECOVERY
PROJECT, LLC; SECURE SIGNALS
INTERNATIONAL; MCGINNIS GROUP
INTERNATIONAL, LLC,
        *Defendants-Appellees.*

No. 04-55036

D.C. No.
CV-03-05972-AHM

OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
November 14, 2005—Pasadena, California

Filed February 15, 2006

Before: Ferdinand F. Fernandez and Marsha S. Berzon,
Circuit Judges, and Owen Panner,* District Judge.

*The Honorable Owen Panner, Senior United States District Judge for
the District of Oregon, sitting by designation.

1669

Opinion by Judge Berzon;
Concurrence by Judge Panner

**COUNSEL**

Jeffrey Willens, Esq., Yorba Linda, California, for the plaintiffs-appellants.

Dale H. Oliver, Los Angeles, California, argued the case for the defendants-appellees. Michael E. Williams and A. Eric Bjorgum, Los Angeles, California, were on the briefs.

## OPINION

BERZON, Circuit Judge:

DIRECTV, Inc., et al. ("DIRECTV") sent tens of thousands of demand letters alleging that the recipients had accessed DIRECTV's satellite television signal illegally and would be sued if they did not quickly settle DIRECTV's claims against them under the Federal Communications Act. Plaintiffs Rod Sosa, et al. ("Sosa") filed this class action lawsuit on behalf of themselves and a putative class of recipients of the letters who reached settlements with DIRECTV, claiming that DIRECTV violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, by mailing the presuit demand letters. The central question before us is whether DIRECTV is immune from liability under RICO, as interpreted in light of the *Noerr-Pennington* doctrine deriving from the Petition Clause of the First Amendment.

## I.

DIRECTV broadcasts television signals via satellite to millions of consumers throughout the United States. The signals broadcast from the satellites are electronically scrambled. To receive the signals in an intelligible manner, the consumer needs to purchase special electronic equipment from third-party vendors, and also needs an access card, or "smart card," supplied by DIRECTV. By using specialized smart card programming equipment, an individual can gain unauthorized access to DIRECTV's signal, in violation of the Federal Communications Act of 1934, 47 U.S.C. § 605. Such equipment has a number of lawful applications as well, such as implementing secure access to computer networks or controlling physical access to buildings or rooms.

In the past several years, DIRECTV, suspicious that the problem of signal theft had become widespread, initiated liti-

gation against several companies selling smart card programming technology. In the course of this litigation, DIRECTV obtained lists of the names and addresses of numerous individuals who had purchased such equipment. DIRECTV obtained no information on the uses to which these individuals were putting this equipment, nor does its satellite technology permit it to determine whether any particular individual is receiving its signal. Using these lists, DIRECTV sent letters to over 100,000 individual purchasers of smart card programming equipment, asserting that DIRECTV had records showing that the recipient had used the equipment to steal its signal, accusing the recipient of violating a federal criminal statute, and threatening civil legal action unless the recipient forfeited the equipment to DIRECTV and paid DIRECTV an unspecified sum to settle its claim.[1] When a number of recipi-

---

[1]A typical letter reads:

Business records recently obtained by this office show that you purchased illegal signal theft equipment to gain unauthorized access to DIRECTV's programming. . . . [Y]our purchase and use, or attempted use . . . violates federal and state laws. . . .

Your purchase, possession and use of signal theft equipment to gain unauthorized access to DIRECTV's satellite television programming subjects you to statutory damages of up to $10,000 per violation. . . . Moreover, your involvement in modifying devices to illegally gain access to DIRECTV's programming increases potential statutory damages to $100,000.

DIRECTV is prepared to release its claims in return for your agreement to: (1) surrender all illegally modified Access Cards or other satellite signal theft devices in your possession, custody or control; (2) execute a written statement to the effect that you will not purchase or use illegal signal theft devices to obtain satellite programming in the future, nor will you have any involvement in the unauthorized reception and use of DIRECTV's satellite television programming; and (3) pay a monetary sum to DIRECTV for your past wrongful conduct and the damages thereby incurred by the company.

If you should choose to reject DIRECTV's settlement offer, or should you fail to respond, please be advised that DIRECTV will

ents contacted DIRECTV by telephone to protest their innocence of the alleged conduct, DIRECTV repeated its accusations and threats to sue. Rather than incur the expense of engaging an attorney to respond, some allegedly innocent recipients, including the three named plaintiffs here, paid DIRECTV thousands of dollars to settle the claims.

Subsequently, a number of recipients, including all the plaintiffs in this action, initiated litigation against DIRECTV in California Superior Court in an action styled *Blanchard v. DIRECTV, Inc.*, No. BC 284166 (Cal Super. Ct., Oct. 28, 2002), asserting, *inter alia*, that the letters constituted extortion and violated California's unfair business practices statute, Cal. Bus. & Prof. Code §§ 17200-17210. DIRECTV opposed the litigation by filing a motion to strike under California's anti-SLAPP[2] statute, Cal. Civ. Proc. Code § 425.16. The state court granted the anti-SLAPP motion, and Sosa appealed.

Subsequently, Sosa filed the present action in the U.S. District Court for the Central District of California, asserting violations of RICO and alleging, *inter alia*, extortion and mail and wire fraud as predicate acts. DIRECTV filed a motion to

---

initiate legal proceedings in Federal District Court seeking the award of damages and other relief . . . .

Copies of the letters received by the named plaintiffs were lodged with the district court prior to the hearing on DIRECTV's motion to dismiss. Although the letter constitutes extrinsic evidence, the district court's consideration of it did not convert DIRECTV's 12(b)(6) motion into a motion for summary judgement, as the letter's authenticity was not contested and the letter was crucial to Sosa's claims. *See Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).

[2]"SLAPP is an acronym for 'strategic lawsuit against public participation.'" *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal.4th 728, 732 n.1 (2003). The anti-SLAPP statute permits summary dismissal of actions "arising from any act of [the defendant] in furtherance of the person's right of petition or free speech" unless the plaintiff can show a probability of success on the claim. Cal. Civ. Proc. Code § 425.16(b)(1).

dismiss under Fed. Rule Civ. P. 12(b)(6), asserting that Sosa had failed to state a claim under RICO and that Sosa's claims were barred by various abstention doctrines and the *Noerr-Pennington* doctrine. The district court granted the motion, basing its ruling solely on the *Noerr-Pennington* doctrine. Sosa then filed this appeal. After the federal action was dismissed but before the hearing on Sosa's appeal, the California Court of Appeal affirmed the anti-SLAPP ruling in the *Blanchard* case, and the California Supreme Court denied review.

We review *de novo* the district court's dismissal for failure to state a claim under Rule 12(b)(6). *Madison v. Graham*, 316 F.3d 867, 869 (9th Cir. 2002).

## II.

On appeal, DIRECTV urges that we need not address the merits of the district court's decision because, under the doctrine of res judicata, the state court decision in the *Blanchard* case precludes the case at bar. To determine the preclusive effect of the state court judgment in *Blanchard*, we look to state law. *Manufactured Home Cmtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1031 (9th Cir. 2005). In California, "[r]es judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002).

[1] Like the federal courts, California courts recognize the rule that where parallel litigation is pending in different tribunals, the first case to reach final judgment is accorded preclusive effect, regardless of the order in which the cases were filed. *Compare Domestic & Foreign Petroleum Co. v. Long*, 4 Cal. 2d 547, 562 (1935) (California rule), *with Americana Fabrics, Inc. v. L & L Textiles, Inc.*, 754 F.2d 1524, 1529 (9th Cir. 1985) (federal rule). California and federal law differ, however, with respect to when a judgment rendered by a trial court becomes a "final judgment" for res judicata purposes.

"Under California law, . . . a judgment is not final for purposes of res judicata during the pendency of and until the resolution of an appeal." *Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1439 (9th Cir. 1985) (citing *Agarwal v. Johnson*, 25 Cal. 3d 932, 954 n.11 (1979), disapproved on other grounds by *White v. Ultramar, Inc.*, 21 Cal.4th 563, 571 (1999), and Cal. Civ. Proc. Code § 1049). The judgment in the *Blanchard* litigation is now final, because there has been a decision on appeal as well as denial of review by the California Supreme Court.

**[2]** In contrast, "[i]n federal courts, a district court judgment is 'final' for purposes of res judicata." *Orion Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1135 n.2 (9th Cir. 2001). This is so even during the pendency of an appeal. *Eichman*, 759 F.2d at 1439. Moreover, "[a] federal [district court] judgment is as final in California courts as it would be in federal courts." *Calhoun v. Franchise Tax Bd.*, 20 Cal.3d 881, 887 (1978).

**[3]** Assuming, without deciding, that the *Blanchard* action and the instant case involve the same cause of action and the same parties, the judgment of the California Court of Appeal cannot be given preclusive effect in the present litigation. The *Blanchard* case was filed on October 28, 2002, and dismissed by the Los Angeles County Superior Court on April 1, 2003, several months before the federal litigation was filed. The district court, however, reached the merits and entered judgment before the *Blanchard* plaintiffs had exhausted their appeals. So, because of the differing rules governing the finality of state and federal judgments, the federal case was the first to reach final judgment. Accordingly, "the [*Blanchard* judgment] can scarcely constitute a bar to the instant action, decided below on an earlier date." *Flood v. Harrington*, 532 F.2d 1248, 1250 (9th Cir. 1976); *see also Freeman United Coal Mining Co. v. Office of Workers' Comp. Program*, 20 F.3d 289, 294 (7th Cir. 1994) (later rendered state industrial commission finding not preclusive in appeal of earlier decided

federal disability claim). We therefore proceed to the merits of the district court's decision.[3]

## III.

The district court dismissed Sosa's suit on the basis that DIRECTV's sending of the demand letters was conduct immunized from RICO liability under the *Noerr-Pennington* doctrine. We review de novo the district court's dismissal on

---

[3]Because we conclude on the merits that the district court should be affirmed, we have no occasion to consider the thorny issue that would arise under *Flood* were we instead to reverse: Would reversing the district court's first-in-time final judgment raise the possibility on remand that the still-valid California final judgment would become preclusive of the federal litigation?

The concurrence assumes the answer to this complicated question, and argues that our decision on the merits is "advisory." *Flood* held that in circumstances where, because of the posture of the case on appeal, res judicata does not apply, the court must address the merits of the appeal. *Flood*, 532 F.2d at 1250. Principles of *stare decisis* require that we follow *Flood* in this regard. *See Baker v. Delta Air Lines, Inc.*, 6 F.3d 632, 637 (9th Cir. 1993) ("We are bound by decisions of prior panels unless an en banc decision, Supreme Court decision, or subsequent legislation undermines those decisions." (citations and internal quotation marks omitted).

Moreover, before we can determine whether the *Flood* rule or some other rule would apply were we to reverse the district court, we must address the merits of the district court's decision. Because our decision on the merits is necessary to the resolution of this case, it is not dictum on any view of the nature of dictum. *Compare Miller v. Gammie*, 335 F.3d 889, 902 (9th Cir.2003) (en banc) (Tashima, J., concurring) ("dictum [i]s a statement made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." (citing *Best Life Assurance Co. v. Comm'r*, 281 F.3d 828, 834 (9th Cir.2002) (citations and internal quotation marks omitted)) *with Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003).("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." (quoting *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc)).

the ground of *Noerr-Pennington* immunity. *Or. Natural Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991).

## A.

**[4]** The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. *Empress LLC v. City & County of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005) (citing *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000)).

The *Noerr-Pennington* doctrine arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment Petition Clause. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), trucking companies brought suit against railroad companies alleging that efforts by the railroads to influence legislation regulating trucking violated the Sherman Act. *Id.* at 129. The Court held that "the Sherman Act does not prohibit . . . persons from associating . . . in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* at 136-37. In reaching this conclusion, the Court observed that construing the Sherman Act to reach such conduct "would raise important constitutional questions" respecting the right of petition, stating "we cannot . . . lightly impute to Congress an intent to invade . . . freedoms" protected by the Bill of Rights. *Id.* at 138.

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965), extended this antitrust immunity to those engaging in lobbying activities directed toward executive branch officials, regardless of any anticompetitive intent or purpose. Subsequently, in *California Motor Transport Co. v. Trucking*

*Unlimited*, 404 U.S. 508 (1972), the Court, recognizing that "the right to petition extends to all departments of the government" and that "[t]he right of access to the courts is . . . but one aspect of the right of petition," extended *Noerr-Pennington* immunity to the use of "the channels and procedures of state and federal . . . *courts* to advocate [groups'] causes and points of view respecting resolution of their business and economic interests *vis-á-vis* their competitors." *Id.* at 510-11 (emphasis added).

Recognizing the constitutional foundation of the doctrine, the Supreme Court has applied *Noerr-Pennington* principles outside the antitrust field. In *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983), the Supreme Court held that the Petition Clause protects access to judicial processes in the labor relations context, and that the labor laws must be interpreted, where possible, to avoid burdening such access. *See id.* at 741-44. In *Bill Johnson's*, a restauranteur filed a civil suit seeking to enjoin employees from picketing his restaurant as part of a unionization campaign. In response, the employees filed an unfair labor practice charge with the National Labor Relations Board, alleging that the civil suit was retaliatory and violated section 8(a) of the of National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (4). *See Bill Johnson's*, 461 U.S. at 734-35. The Court, citing *California Motor Transport*, held that, in light of the protection afforded to the right of access to the courts by the Petition Clause, a construction of the NLRA permitting the Board to enjoin a well-founded but retaliatory lawsuit was untenable. *Id.* at 743.

**[5]** In *BE&K Construction Co. v. NLRB*, 536 U.S. 516, 525 (2002), the Supreme Court expanded on its holding in *Bill Johnson's*, making clear that the principles of statutory construction embodied in the *Noerr-Pennington* doctrine apply with full force in other statutory contexts. In *BE&K*, the Court considered whether the National Labor Relations Act, 29 U.S.C. §§ 151-169, permits the National Labor Relations Board to impose liability on an employer for its unsuccessful

prosecution of lawsuits that, while not objectively baseless, were brought for the purpose of retaliating against workers for exercising the rights the NLRA protects. *BE&K*, 536 U.S. at 529-30. In concluding that it does not, the Court conducted a three step analysis: The Court first identified the burden that the threat of an adverse NLRA adjudication imposes on an employer's petitioning rights. *Id.* at 530. The Court then examined the precise petitioning activity at issue, to determine whether the burden on that activity implicated the protection of the Petition Clause. *Id.* at 530-33. Finally, the Court analyzed the NLRA to see whether it could be construed so as to preclude such a burden on the protected petitioning activity. *Id.* at 535-37.

The Court concluded that a finding that a lawsuit was illegal "is a burden by itself," because various legal consequences flow from such a finding and because such a finding "poses the threat of reputational harm that is different and additional to any burden posed by other penalties." *Id.* at 530. At the second step of its analysis, the Court focused on whether the burdened petitioning conduct — there, the filing of reasonably based but unsuccessful lawsuits — fell within the protection of the Petition Clause. Analogizing to the speech context, the Court analyzed whether, giving the right of petition "that breathing space essential to [its] fruitful exercise," *id.* at 531 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)) (internal quotation marks omitted), such lawsuits fall within the protection of the Petition Clause. *Id.* The Court found that because the lawsuits at issue were not baseless, they did not fall within the established "sham litigation" exception laid out in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PRE II*"), or within the analogous rule in the labor law context established in *Bill Johnson's*. Canvassing a number of reasons why the Petition Clause might require protection of "the class of reasonably based but unsuccessful lawsuits," the Court concluded that "whether this class of suits falls outside the scope of the First Amendment's Petition

Clause . . . presents a difficult constitutional question," BE&K, 536 U.S. at 531-32, even where such suits were brought with a retaliatory motive, *id.* at 534-35.

**[6]** Proceeding to the final step of its analysis, the Court construed the NLRA narrowly to avoid the constitutional issue. The Court observed that "[i]n a prior labor law case, we avoided a similarly difficult First Amendment issue by adopting a limiting construction of the relevant NLRA provision." *Id.* at 535 (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).[4] Following *DeBartolo,* and consistent with the statutory construction principles applied in the *Noerr-Pennington* line of cases, the *BE&K* Court found the relevant section of the NLRA, section 8(a)(1), 29 U.S.C. § 158(a)(1), susceptible of both a broad construction that might reach the lawsuits at issue, as well as a narrow construction that would not. *BE&K*, 536 U.S. at 536. The Court found "nothing in the statutory text indicating that §158(a)(1) must be read to reach all reasonably based but unsuccessful suits filed with a retaliatory purpose," and, to avoid implicating the Petition Clause, adopted the narrower reading. *Id.*

**[7]** In light of *BE&K*'s application of *Noerr-Pennington* to the NLRA, we conclude that the *Noerr-Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause. *See White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) (holding, before *BE&K*, that because it "is based on and implements the First Amendment right to petition," the *Noerr-Pennington* doctrine is not limited to the antitrust context, but "applies equally in all con-

---

[4]The *DeBartolo* case involved a lawsuit to enjoin handbilling by a labor union. Finding that neither the statute nor the legislative history indicated the clear congressional intent to reach the handbilling at issue, the Court declined to give the applicable NLRA provision a construction that would raise serious First Amendment questions. *DeBartolo*, 485 U.S. at 578-88.

texts"). Under the *Noerr-Pennington* rule of statutory construction, we must construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise.[5] We will not "lightly impute to Congress an intent to invade . . . freedoms" protected by the Petition Clause. *Noerr*, 365 U.S. at 138.

In determining whether the burdened conduct falls under the protection of the Petition Clause, we must give adequate "breathing space" to the right of petition. *BE&K*, 536 U.S. at 531. On the other hand, neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them. Where, however, the burdened conduct could fairly fall within the scope of the Petition Clause and a plausible construction of the applicable statute is available that avoids the burden, we must give the statute the reading that does not impinge on the right of petition.[6]

---

[5]In this sense, *Noerr-Pennington* is a specific application of the rule of statutory construction known as the canon of constitutional avoidance, which requires a statute to be construed so as to avoid serious doubts as to the constitutionality of an alternate construction. *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems."); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring) (same).

[6]Even before *BE&K* clarified that the principal application of the *Noerr-Pennington* doctrine is as a rule of statutory construction, the body of *Noerr-Pennington* law in our circuit has so applied the doctrine in cases falling outside of the antitrust context. For example, in *White*, the U.S. Department of Housing and Urban Development ("HUD") conducted an eight-month investigation into whether plaintiffs' advocacy activities and state court lawsuit opposing the development of a multi-family housing unit in their neighborhood violated the Federal Housing Act ("FHA"), and as a result, HUD officials advised plaintiffs to cease their litigation activities. *White*, 227 F.3d at 1220. Plaintiffs challenged this investigation as a violation of their rights of free speech and petition. *Id.* We declined to

## B.

Applying these principles here, we must determine whether Sosa's RICO lawsuit burdens DIRECTV's petitioning activities. If it does, we must examine the precise petitioning conduct DIRECTV engaged in to determine whether the burden identified may be imposed consistently with the Constitution. If there is a substantial question that it may not, we must determine whether RICO or the RICO predicate acts Sosa alleges clearly provide for liability for the conduct at issue. If a reasonable construction of RICO or the predicate act statutes exists that avoids the burden, we will adopt that construction. Only where the statutes clearly provide for the burden posed by the lawsuit will we address whether the statute may

construe the FHA broadly to reach the constitutionally protected activities at issue in the case. *Id.* at 1239. Following *Noerr-Pennington*, we held that the FHA did not preclude the filing of a reasonable but unsuccessful lawsuit, and instead imported into the FHA context the narrow "sham litigation" exception of *PRE II. Id.* at 1232-33; *see also id.* at 1232 n.14 (observing without deciding that the *Noerr-Pennington* doctrine may "provide[ ] broader protection than the First Amendment"). We have similarly applied Noerr-Pennington as a rule of construction in other statutory contexts. *See Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) (*Noerr-Pennington* doctrine's reach "extends only so far as necessary to steer the Sherman Act clear of violating the First Amendment."); *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000) (declining to interpret 42 U.S.C. § 1983 as subjecting governmental entities or officials to liability for activity that would otherwise be with the protection of the *Noerr-Pennington* doctrine).

Other circuits have similarly used *Noerr-Pennington* principles to guide their interpretation of statutes, *see*, *e.g.*, *Tarpley v. Keistler*, 188 F.3d 788, 794-95 (7th Cir. 1999) (refusing to construe 42 U.S.C. § 1983 as extending conspiracy liability to petitioning activity), as well as their application of common law doctrines, *see*, *e.g.*, *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) ("There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust.").

be applied to the petitioning conduct consistently with the Constitution.

**1.**

**[8]** Sosa's lawsuit seeks to impose RICO liability on DIRECTV for sending the demand letters. A successful RICO claim would quite plainly burden DIRECTV's ability to settle legal claims short of filing a lawsuit. Like the antitrust laws, RICO provides for private enforcement and treble damages. *Compare* 15 U.S.C. § 15(a) (Clayton Antitrust Act), *with* 18 U.S.C. § 1964(c) (RICO); *see also BE&K*, 536 U.S. at 528-29 (noting that treble damages provisions and private enforcement demonstrate that antitrust suits may "pose a *greater* burden on petitioning than the threat of an NLRA adjudication"). Accordingly, Sosa's RICO suit poses a burden on DIRECTV's communication of the demand letters almost identical to that posed by the Sherman Act claims on the petitioning conduct at issue in *Noerr* and its progeny.

**2.**

At the second step of the *BE&K* analysis, the question is whether imposing these burdens on the sending of prelitigation demand letters runs afoul of the Petition Clause. In analyzing this question, we must consider whether the demand letters constitute either protected petitioning activity or activity which must be protected to afford breathing space to the right of petition guaranteed by the First Amendment.

**[9]** We have observed that only litigation activities which constitute "communication[s] to the court" may be fairly described as "petitions." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005). Such communications include "[a] complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something."

*Id.* In contrast, the demand letters at issue in this case were not communicated to the court, but were directed to private parties prior to any petition being filed with the court.

[10] This conclusion is not the end of the inquiry, however. Although the letters were not themselves petitions, the Petition Clause may nevertheless preclude burdening them so as to preserve the breathing space required for the effective exercise of the rights it protects. The notion of First Amendment breathing space derives from cases in the Freedom of Speech arena. In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court held that, to adequately safeguard the freedom of speech, a defamation plaintiff who is a public official must prove not only falsehood but also actual malice, thereby providing protection to some false statements. *Id.* at 279-80. "Although the erroneous statement of fact is not worthy of constitutional protection, . . . [t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz*, 418 U.S. at 340-41. The protection is necessary "to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." *Id.* at 342.

Thus, under the breathing space principle, the First Amendment protects two kinds of activities that do not come within the protection of the speech clause in their own right: First, certain classes of speech not meriting protection in themselves — the false statements in *New York Times*, for example — must nevertheless be protected in order fully to vindicate the free speech rights guaranteed by the First Amendment. *See, e.g.*, *New York Times*, 376 U.S. at 279-80, 285 (holding that false statements about public officials not made with actual malice cannot give rise to damages for defamation). Second, certain conduct, not in itself speech, is protected in order adequately to protect the actor's ability to exercise his free speech rights. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 17 (1976) (per curiam) (holding that conduct of giving or spending money in political campaigns may not be regulated where conduct is

integrally intertwined with communication) (citing *United States v. O'Brien*, 391 U.S. 367, 382 (1968)).

These principles are similarly applicable in the Petition Clause context. *PRE II* recognized the applicability of the first aspect of the breathing space principle when it defined the *Noerr-Pennington* doctrine's "sham litigation" exception as requiring *both* objective baselessness and an improper motive. *PRE II*, 508 U.S. at 60-61. This definition overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution. *BE&K* made this breathing room protection explicit. Recognizing that under *New York Times* and *Gertz*, false statements are not wholly unprotected by the First Amendment, the Court observed that baseless litigation might also require protection in some circumstances. *BE&K*, 536 U.S. at 531. Accordingly, the Court noted, "we have never held that the entire class of objectively baseless litigation may be enjoined or declared unlawful even though such suits may advance no First Amendment interests of their own." *Id.*

The second aspect of the breathing space principle was recognized in *Noerr* itself, where the Court extended immunity not only to the railroads' direct communications with legislators but also to its public relations campaign, finding that the latter's aim was to influence the passage of favorable legislation. *Noerr*, 365 U.S. at 140-43. Building on this aspect of *Noerr*, the Supreme Court, in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, held that "private action . . . cannot form the basis for antitrust liability if it is 'incidental' to a valid effort to influence governmental action." 486 U.S. 492, 499 (1988) (quoting *Noerr*, 365 U.S. at 143). Similarly, in a series of cases culminating in *United Mine Workers of America v. Illinois State Bar Ass'n*, 389 U.S. 217 (1967), the Court held that laws restricting the ability of unincorporated associations to employ attorneys for their members, *id.* at 221-22, or to advise their members to seek legal advice and to recommend specific lawyers, *Bhd. of R.R. Trainmen v. Virginia ex rel. Va.*

*State Bar*, 377 U.S. 1, 8 (1964), violated the members' rights of association and petition, notwithstanding that such laws did not directly restrict the members' access to the courts or ability to obtain counsel independently. *Ill. State Bar Ass'n*, 398 U.S. at 222; *Trainmen*, 377 U.S. at 8; *see also United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585-86 (1971)*; NAACP v. Button*, 371 U.S. 415, 433 (1963). This is so because, to exercise its petitioning rights meaningfully, a party may not be subjected to liability for conduct intimately related to its petitioning activities. "The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such." *Ill. State Bar Ass'n*, 389 U.S. at 222.

Consistent with the breathing space principle, we have recognized that, in the litigation context, not only petitions sent directly to the court in the course of litigation, but also "conduct incidental to the prosecution of the suit" is protected by the *Noerr-Pennington* doctrine. *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528-29 (9th Cir. 1991) ("*PRE I*"), *aff'd* 508 U.S. 49 (1993); *see also Freeman*, 410 F.3d at 1184.[7] In *PRE I*, the defendant, Professional Real Estate Investors ("PRE"), brought antitrust counterclaims predicated in part on Columbia's refusal to enter into settlement negotiations with respect to Columbia's copyright infringement suit. We held that "[a] decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct

---

[7]In *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078-79 (9th Cir. 2004), we stated in dicta that "[w]e are skeptical that *Noerr-Pennington* applies at all to" a subpoena directed to a private party in private commercial litigation. Nevertheless, we declined to reach the issue, finding that even if *Noerr-Pennington* applied, the subpoena was objectively baseless and fell within the doctrine's sham exception. *Id.* at 1079. In *Freeman*, we answered the question left open in *Theofel*, concluding that private litigation communications in commercial litigation sufficiently implicate the exercise of petitioning rights to trigger *Noerr-Pennington* protection. 410 F.3d at 1184.

activity which might form the basis for antitrust liability." *PRE I*, 944 F.2d at 1528. We concluded that *Noerr-Pennington* applied with equal force to such conduct. *Id.* at 1529. Thus, where the underlying litigation fell within the protection of the Petition Clause, such incidental conduct would also be protected. *Id.*

In *Freeman*, the plaintiff brought suit alleging that discovery misconduct in related litigation constituted a violation of the antitrust laws. 410 F.3d at 1183. The court held that discovery communications, while not themselves petitions, constitute "conduct incidental to a petition." *Id.* at 1184 (internal quotation marks omitted). Therefore, unless the underlying petition itself fell outside the protection of the right of petition, these communications come within the *Noerr-Pennington* doctrine. *Id.*

**[11]** Accordingly, the law of this circuit establishes that communications between private parties are sufficiently within the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to petitioning activity.[8]

Here, the conduct alleged to enjoy *Noerr-Pennington* immunity was DIRECTV's communication of settlement demands prior to initiating any actual litigation. Unlike the situations in *PRE I* and *Freeman*, there was no suit ongoing, and thus, no existing "petition" to which the settlement demands were incidental.

Sosa contends that this distinction is decisive. He argues

---

[8]We also reject Sosa's argument that because the demand letters here were sent from one private party to another to further DIRECTV's commercial interests, they do not implicate the Petition Clause. Indeed, in nearly every instance in which *Noerr-Pennington* has been applied, including *Noerr* itself, the petitioning conduct at issue was carried out to further the petitioning party's commercial interests.

that extending Petition Clause protection to conduct incident to actual litigation is justified because any misconduct engaged in during litigation is subject to control by the court via contempt proceedings or sanctions under the Federal Rules of Civil Procedure. In contrast, according to Sosa, a party faced with an extortionate presuit demand has no recourse to a court in an existing proceeding, and must incur the expense of retaining counsel to respond to meritless claims.

We are not persuaded that this distinction changes the analysis. It is a fact of our system of justice that parties are often compelled to engage counsel and defend lawsuits that ultimately prove to have little merit. While responding to demands to settle unfounded claims is burdensome, it is likely less burdensome than if the opposing party, fearing liability in tort for demanding settlement of a possibly weak claim, proceeded directly to litigation. Moreover, the established sham exception to the *Noerr-Pennington* doctrine provides adequate protection against baseless claims asserted in prelitigation settlement letters. *See PRE II*, 508 U.S. at 60-61; *see also Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) (citing cases and describing three pronged sham litigation exception).

**[12]** We conclude that restrictions on presuit demand letters may therefore raise substantial Petition Clause issues if, on examination, such restrictions could impair the right of access to the courts protected by the First Amendment. We conclude, for several reasons, that the connection between presuit demand letters and access to the courts is sufficiently close that the Petition Clause issues raised by providing a treble-damages remedy with regard to such letters are indeed substantial.

First, preceding the formal filing of litigation with an invitation to engage in negotiations to settle legal claims is a common, if not universal, feature of modern litigation. Even if it

does not result in a final resolution of the dispute and vindication of the legal rights at issue, this practice permits parties to frame their legal positions, often streamlining any subsequent litigation, and thereby reducing legal costs and facilitating access to the courts. Restricting such prelitigation conduct when the same demands asserted in a petition to the court is protected would render the entire litigation process more onerous, imposing a substantial burden on a party's ability to seek redress from the courts.

Second, many states, including California, protect prelitigation communications under statutorily granted litigation privileges. *See*, *e.g.*, *Rubin v. Green*, 4 Cal. 4th 1187, 1193-94 (1993) (discussing Cal. Civ. Code § 47(b)); *accord Kirschstein v. Haynes*, 788 P.2d 941, 947 (Okla. 1990) (adopting the rule of Restatement (Second) of Torts § 586 that "communications preliminary to a proposed judicial proceeding" are protected under the litigation privilege (quoting Restatement (Second) of Torts § 586 (1977))). Such laws highlight the intimate relationship between presuit settlement demands and the actual litigation process. Moreover, such privileges indicate that, unlike the lobbying of a private organization as in *Allied Tube*, the demand letters at issue here are not "the type of commercial activity that ha[ve] traditionally had [their] validity determined by" generally applicable regulatory statutes. *Allied Tube*, 486 U.S. at 505. On the contrary, they are the type of activity that typically arises only in the context of contemplated petitioning activity.

Third, extending immunity to private presuit demand letters protects the same interests the Supreme Court has identified as implicated in the Petition Clause's protection of private litigation. *See*, *e.g.*, *Bill Johnson's*, 461 U.S. at 743. Thus, in *Bill Johnson's*, the Court observed that "[t]he first amendment interests involved in private litigation" include "compensation for violated rights and interests, the psychological benefits of vindication, [and] public airing of disputed facts." 461 U.S. at 743 (internal quotation marks omitted). Similarly, "the ability

to lawfully prosecute even unsuccessful suits adds legitimacy to the court system as a designated alternative to force." *BE&K*, 536 U.S. at 532. These interests are equally served when disputes are resolved outside the formal litigation process through presuit settlement demands, backed up by the possibility of resort to the courts.

Fourth, our conclusion is consistent with established Supreme Court law rejecting burdens on the right to petition the courts even where no actual litigation was pending. *See Ill. State Bar Ass'n*, 389 U.S. at 222. It is also consistent with our decision in *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), in which we held that *Noerr-Pennington* immunity extended to an individual who funded anticompetitive litigation but was not himself a party to the litigation and was therefore not himself petitioning the courts. *Id.* at 157-59; *accord Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 397-99 (4th Cir. 2001) (holding secret funding of a lawsuit brought against a potential competitor to maintain a monopoly was protected under *Noerr-Pennington*, even though the funding party was not a litigant).

Fifth, extending *Noerr-Pennington* immunity to litigation-related activities preliminary to the formal filing of the litigation is consistent with the law of the majority of other circuits that have considered the issue. *See, e.g.*, *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 100 (2d Cir. 2000) (holding presuit challenges to signal strength determinations by satellite broadcasters within the protection of *Noerr-Pennington*); *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343-44 (Fed. Cir. 1999) (holding that threat of patent enforcement litigation could not subject patent holder to antitrust liability); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992) (holding that concerted threats of litigation are protected under *Noerr-Pennington*); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850-51 (1st Cir. 1985) (holding that threat of trade-secret litigation must be a sham to expose maker to antitrust liability); *Coastal States Mktg., Inc.*

*v. Hunt*, 694 F.2d 1358, 1367-68 (5th Cir. 1983) (extending petitioning immunity to generalized threats to litigate to protect claim to oil assets).

In arguing for a contrary result, Sosa relies entirely on a Tenth Circuit case, *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885 (10th Cir. 2000) (en banc). In *Cardtoons*, the Tenth Circuit held that neither the *Noerr-Pennington* doctrine nor the Petition Clause protected a presuit cease-and-desist letter asserting trademark infringement.[9] *Id.* at 886-88. Sosa attempts to distinguish the substantial body of contrary law and argues that *Cardtoons* is the only authority directly relevant to the issue before us.

As Sosa correctly observes, all of the appellate cases that have extended immunity to presuit settlement demands have done so in the context of antitrust suits. We do not see the relevance of this observation. We recognize that *Noerr* and its progeny were based in part on a construction of the antitrust laws. As we have already observed, however, *BE&K*, decided after *Cardtoons*, compels a similar construction of other laws to the extent they impinge on the right of petition. Consequently, we regard the *Cardtoons* decision as an outlier, inconsistent with the weight of authority relevant to the First Amendment status of presuit litigation-related conduct. More importantly, we are doubtful that the majority's opinion in *Cardtoons* survives the Supreme Court's decision in *BE&K*. The reasoning of the *Cardtoons* dissenters, concluding that prelitigation demand letters are within the scope of the Peti-

---

[9]*Cardtoons* reasoned that a prelitigation letter directed from one private party to another, rather than to the government, and sent to further the business interests of the sender did not implicate the Petition Clause. 208 F.3d at 892-93. In dissent, Judge Lucero, joined by Judges Brorby and Briscoe, argued that, "[b]ased on the interests served by the Petition Clause and the requirement that First Amendment rights be given 'breathing space,' the concept of petitioning activity must embrace [a presuit] cease-and-desist letter." *Id.* at 896 (Lucero, J., dissenting).

tion Clause, is, in our view, the more persuasive and the more consistent with *BE&K*.

Finding that the protections of the Petition Clause extend to prelitigation settlement demands as a class does not mean that such demands are absolutely protected from liability. "The Petition Clause . . . was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble . . . , and there is no sound basis for granting greater constitutional protection to statements made in a petition to the [government] than other First Amendment expressions." *McDonald v. Smith*, 472 U.S. 479, 485 (1985). In general, "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *Cal. Motor Trans.*, 404 U.S. at 514. Accordingly, *Noerr-Pennington* immunity is not a shield for petitioning conduct that, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144.

In *PRE II*, the Supreme Court established a two-part definition of the "sham litigation" exception to *Noerr-Pennington* in the antitrust context. 508 U.S. at 60-61. To establish that a petition to the court is a sham, the party seeking to impose liability must establish both that the legal claim is objectively baseless and that the suit was brought for an anticompetitive purpose. *BE&K* left open the question whether a similar two-part test would apply in the labor relations context. 536 U.S. at 536-37. The Court found that the evidence of an improper purpose was insufficient to impose liability for a reasonably based but unsuccessful suit, but declined to hold that such suits are categorically immune.

In *Kottle*, we identified three circumstances in which the sham litigation exception might apply: first, where the lawsuit is objectively baseless and the defendant's motive in bringing

it was unlawful, 146 F.3d at 1060; second, where the conduct involves a series of lawsuits "brought pursuant to a policy of starting legal proceedings without regard to the merits" and for an unlawful purpose, *id.* (citing *USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council*, 31 F.3d 800, 810-11 (9th Cir. 1994)); and third, if the allegedly unlawful conduct "consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.' " *Id.* (quoting *Liberty Lake*, 12 F.3d at 159).

We have applied this test in other litigation contexts as well. *See White*, 227 F.3d at 1232-33. In addition, we have observed that private discovery conduct, not itself a petition, may fall within the sham exception where either the conduct itself, *Theofel*, 359 F.3d at 1079, or the underlying petition, *Freeman*, 410 F.3d at 1185, meets *PRE II*'s sham litigation test. We need not decide precisely how *PRE II*'s or *Kottle*'s definition of sham litigation applies to presuit demand letters in the RICO context, however, because Sosa has declined to argue that the letters fall within the sham exception.

**[13]** In sum, whether, to preserve the breathing space essential to the fruitful exercise of the right of petition, the First Amendment requires the extension of *Noerr-Pennington* immunity to the making of reasonably based prelitigation settlement demands "at the least presents a difficult constitutional question." *BE&K*, 536 U.S. at 532. Accordingly, we proceed to the third step of the *BE&K* analysis and analyze whether RICO may be fairly construed to avoid reaching the constitutional issue.

**3.**

The question at this stage is whether, given the important goals of RICO, the statute proscribes the sending of prelitigation demand letters asserting legal claims that may be weak

but do not rise to the level of shams. In answering this question, we must bear in mind the principle that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

Leaving aside the other elements of a civil RICO claim, RICO imposes civil and criminal liability on organizations engaged in "racketeering activity." 18 U.S.C. §§ 1962-1964. Racketeering activity, in turn, is defined to include a number of generically specified criminal acts as well as the commission of one of a number of listed predicate offenses. *Id.* § 1961(1). RICO's general definition of racketeering activity does not in terms clearly reach the conduct at issue here. Accordingly, we turn to the particular RICO predicates alleged here to determine whether they do so or whether, instead, they are susceptible of a construction that avoids the serious constitutional question of Petition Clause immunity.

In his complaint, Sosa alleged violations of the federal mail and wire fraud statutes, *id.* §§ 1341, 1343, the Hobbs Act, *id.* § 1951, the interstate racketeering statute, *id.* § 1952, the federal money laundering statues, *id.* §§ 1956-1957, and the statutes prohibiting movement of stolen property in interstate commerce, *id.* §§ 2314-2315, as well as extortion under California law, Cal. Penal Code §§ 518-520, 523. Only the mail and wire fraud, Hobbs Act, and state extortion predicates can even arguably be read to reach the conduct at issue here.

**[14]** The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). While on its face, this provision could be read broadly to reach the class of suits at issue here, it need not be so read. It is cer-

tainly possible, perhaps even likely, that the threat of being faced with a costly lawsuit induced "fear" in Sosa, but extortion requires more than fear. *See Rothman v. Vedder Park Mgmt.*, 912 F.2d 315, 318 (9th Cir. 1990) (holding that inducing fear of economic loss could not in itself constitute extortion). The use of the fear must be "wrongful." 18 U.S.C. § 1951(b)(2); *see Rothman*, 912 F.2d at 318. It is true that the assertion of weak claims predicated on unsupportable factual allegations may be said in some sense to be wrongful. Such a broad reading of the term "wrongful" is not required, however. Applying the *Noerr-Pennington* statutory construction presumption, we do not believe the Hobbs Act imposes liability for threats of litigation where the asserted claims do not rise to the level of a sham.[10] California's extortion statute likewise requires the "wrongful use of . . . fear," *see* Cal. Penal Code § 518, and is equally susceptible of our narrow reading. *See In re Nichols*, 82 Cal. App. 73, 76 (1927) (holding extortion predicated on threat to sue requires allegation that threatened suit was objectively baseless).

[15] Similarly, the mail and wire fraud statutes do not unambiguously reach demands to settle reasonably based legal claims. Both statutes require a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341, *see also id.* § 1343. This language has been given a broad interpretation, *see United States v. Louderman*, 576 F.2d 1383, 1388 (9th Cir. 1978), and may be read to reach certain types of fraudulent settlement communications.

---

[10]Other circuits have reached similar results, many refusing to impose Hobbs Act liability even on baseless litigation. *See, e.g.*, *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002) (holding threats to sue a public entity cannot constitute Hobbs Act extortion, even where supported by false testimony and fabricated evidence); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) (holding threats of groundless litigation cannot constitute extortion under the Hobbs Act); *cf. Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (holding threats to enforce even a fraudulent contract not extortion under RICO).

Indeed, in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005), we permitted the plaintiffs to maintain a RICO suit predicated on fraudulent discovery conduct in prior litigation that induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud. *Id.* at 365. The defendants had failed during the prior litigation to disclose damaging evidence which was solely in their possession and had falsely claimed that the evidence did not exist. *Id.* at 356-58. We concluded that such conduct could amount to mail fraud, notwithstanding its connection to a legal proceeding. *Id.* at 364-65. Although we did not explicitly discuss the *Noerr-Pennington* doctrine, the conduct alleged quite clearly fell within the third prong of *Kottle*'s sham litigation exception, in that it amounted to a "knowing fraud upon . . . the court depriv[ing] the litigation of its legitimacy," *Kottle*, 146 F.3d at 1060 (citing *Liberty Lake*, 12 F.3d at 159), and was done for the prohibited purpose of injuring plaintiffs' business or property interests. *Living Designs*, 431 F.3d at 363-64.

Here, Sosa has alleged that in its demand letters and in telephone conversations with Sosa and the other plaintiffs, DIRECTV made false representations of fact and law, and that as a result Sosa settled DIRECTV's claims. It is well established, however, that misrepresentations of the law are not actionable as fraud, including under the mail and wire fraud statutes, because statements of the law are considered merely opinions and may not be relied upon absent special circumstances not present here. *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004).

**[16]** We would independently reach the same conclusion here regarding the asserted misrepresentations of law in the presuit demand letters, applying our understanding of the *Noerr Pennington* doctrine. On that understanding, presuit letters threatening legal action and making legal representations in the course of doing so cannot come within a statutory restriction unless the statute unavoidably so requires, absent

representations so baseless that the threatened litigation would be a sham. The mail and wire fraud statutes do not unavoidably so require. Rather, they can be, we conclude, construed to avoid burdening the ability of potentially adverse parties to make legal representations in demand letters and other presuit communications sent in contemplation of possible litigation. Nothing in the mail and wire fraud statutes addresses the issue of legal representations directly. Nor need we impute to Congress an intent to include within the statutory phrase "scheme or artifice to defraud" erroneous representations of law made in a presuit demand letter; legal representations made by potential litigation adversaries are exceedingly unlikely to be believed without investigation. Further, Sosa has declined to invoke the sham exception, so that is off the table. DIRECTV's assertions that Sosa's conduct was unlawful, therefore, cannot support the mail and wire fraud predicates, even if DIRECTV intentionally misstated the law.

Whether the alleged misrepresentations of fact could, if proven, constitute mail or wire fraud is less clear. In the criminal context, presuit settlement demands containing false statements of fact can under some circumstances constitute mail fraud. *E.g.*, *United States v. Marbella*, 73 F.3d 1508, 1511 (9th Cir. 1996) (affirming conviction for insurance fraud based on settlement demand containing false medical claims). Such letters cannot amount to mail fraud, however, where the sender knows the recipient will not be deceived by the falsehoods. *See United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002) (where the senders knew that the recipient would not be deceived by falsehoods, "they could not have had an intent to deceive" as required for mail and wire fraud liability).

Here, Sosa argues that DIRECTV's threat to sue "within 14 days" was false and constituted mail fraud. Sosa acknowledges that many thousands of lawsuits were ultimately filed against recipients who failed to settle DIRECTV's claims, but he contends that most of these suits were not filed within 14

days, and that DIRECTV never intended to sue all of those to whom it sent the letter. We are dubious that this statement would be actionable under any circumstances. We need not reach this question here, however. "It is well settled that, to maintain a civil RICO claim predicated on mail [or wire] fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Sosa utterly fails to show how DIRECTV's false threat to sue within 14 days proximately caused him any injury.

Sosa further contends that DIRECTV's assertion that it had documents showing that he had "purchased . . . signal theft equipment to gain unauthorized access to DIRECTV's programming" and its other allegations concerning Sosa's unauthorized access to its signal were false and amounted to a scheme or artifice to defraud. He argues that as a result of these statements, he was induced to settle with DIRECTV. As in *Pendergraft*, DIRECTV's statements asserting that Sosa had modified smart cards and used smart card programming equipment to access its signal without paying for it cannot constitute mail or wire fraud. Because these statements concerned Sosa's own conduct, DIRECTV could not have intended that he would be deceived by them and was therefore necessarily lacking in the intent requisite to have committed mail or wire fraud. *Pendergraft*, 297 F.3d at 1209.

Sosa also alleges that, contrary to its assertion in the letter, DIRECTV had no business records showing that Sosa had actually used the equipment to access its signal. In fact, the letter does not unambiguously assert that the records showed the use to which Sosa put the equipment. It states that they "show that you purchased . . . signal theft equipment to gain unauthorized access to DIRECTV's programming." Sosa readily admits that he purchased the equipment to which DIRECTV refers. The phrase "to gain unauthorized access to DIRECTV's programming" is ambiguous: It is not clear

whether this statement means that the records themselves indicated the use to which Sosa had put the equipment, or rather that DIRECTV believed on the basis of the records that Sosa had used it to access its signal.

This ambiguity may have been intentional, and may even have been intended to suggest that DIRECTV's evidence was stronger than it in fact was. Sosa has not argued, and likely could not argue, however, that this statement rendered DIRECTV's claim against him a sham. Given the *Noerr-Pennington* presumption, we are not convinced that the mail and wire fraud statutes reach this kind of carefully worded statement, so characteristic of the posturing that occurs at the start of any litigation and capable of being tested in any ensuing suit. In addition, it should have been obvious that in any such suit, the dispositive issue would not be what DIRECTV's records showed about Sosa's activities, but what those activities actually were — a matter, once again, fully within Sosa's knowledge and capable of proof. In light of the burden RICO liability would impose on DIRECTV's right to petition the courts, we decline to construe mail and wire fraud statutes so broadly as to reach peripherally relevant, arguably ambiguous statements such as this single representation in DIRECTV's demand letters, absent a showing that the statement meets the standard for the sham exception. *See Kottle*, 146 F.3d at 1060.

**[17]** Accordingly, we hold that RICO and the predicate statutes at issue here do not permit the maintenance of a lawsuit for the sending of a prelitigation demand to settle legal claims that do not amount to a sham. Because the demand letters at issue here sought settlement of claims against Sosa under the Federal Communications Act, and no sham is claimed, they cannot form the basis of liability under RICO.

Because we affirm the district court's ruling on the basis of the *Noerr-Pennington* doctrine, we need not address the other bases for dismissal asserted by appellees below and on appeal.

## IV.

Our decision today makes clear that the *Noerr-Pennington* doctrine requires that, to the extent possible, we construe federal statutes so as to avoid burdens on activity arguably falling within the scope of the Petition Clause of the First Amendment. Prelitigation communications demanding settlement of legal claims must be afforded *Noerr-Pennington* protection when we construe statutes asserted to regulate them. RICO does not unambiguously include the presuit demand letters in this case within the scope of conduct it enjoins, so we decline to give it such a broad construction. Accordingly, we affirm the judgment of the district court holding DIRECTV immune from liability and dismissing Sosa's complaint.

**AFFIRMED**.

PANNER, District Judge:

I respectfully concur in the result.

The majority opinion is essentially advisory. If we affirm the decision of the district court, Sosa loses. If we reverse the district court and reinstate this action, Sosa still loses because the California state court judgment is now final and would bar all of Sosa's claims.[1] I would file a short order stating that

---

[1] In my view, *Flood v. Harrington*, 532 F.2d 1248 (9th Cir. 1976), does not command otherwise. *Flood* had no occasion to consider what effect a California court would give to the judgment, as we must do here. *See* 28 U.S.C. § 1738. The plaintiff in *Flood* did not lose in state court, and then file essentially the same action in federal court, as Sosa did here. Rather, the decision on appeal in *Flood* was entered first, and both decisions were entered by a federal court. Furthermore, the two actions in *Flood* involved different claims and parties. Lastly, *Flood* did not consider what would transpire on remand had the panel found in favor of the plaintiff, and reinstated his action.

fact, and reserve the extensive discussion of *Noerr-Pennington* and RICO for a case in which it is necessary to decide those questions.