**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BENJAMIN KOZIOL, AKA Benjamin
Joseph Donovan, AKA Benjamin
Joseph Koziol,
*Defendant-Appellant.*

No. 19-50018

D.C. No.
2:18-cr-00022-
CAS-1

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted April 22, 2020
Pasadena, California

Filed April 13, 2021

Before: Carlos T. Bea and Bridget S. Bade, Circuit Judges,
and Gershwin A. Drain,[*] District Judge.

Opinion by Judge Bade

---

   [*] The Honorable Gershwin A. Drain, United States District Judge
for the Eastern District of Michigan, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction for attempted extortion under the Hobbs Act, 18 U.S.C. § 1951(a), for threatening to file against a well-known entertainer a suit asserting salacious and scandalous allegations if the entertainer didn't settle for $1,000,000; vacated the sentence; and remanded for resentencing.

The defendant argued that his conviction must be reversed because the threat of litigation, even when "frivolous, meritless, or made in bad faith," can never constitute "wrongful" conduct under the Hobbs Act, which imposes criminal liability for extortion on those who obtain property from another by the "wrongful use of . . . fear." The panel concluded that there is no statutory, constitutional, or policy basis to exclude categorically threats of sham litigation from criminal liability under the Hobbs Act. The panel therefore affirmed the denial of the defendant's motion for acquittal on this basis.

The panel wrote that the circumstances of the threats must be considered to determine if the means used were "wrongful" under the Act, of if the ends were "wrongful" because the defendant sought property to which he knew he had no lawful claims. Rejecting the defendant's sufficiency-of-the-evidence challenge, the panel held that when viewed in the light most favorable to the government, the evidence was more than sufficient for the jury to conclude beyond a

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reasonable doubt that the defendant knew his claims against the entertainer were baseless and that he had no right to demand money from the entertainer.

The panel rejected the defendant's arguments of instructional and evidentiary error.

The panel held that the district court did not err by applying a fourteen-level increase under U.S.S.G. § 2B3.3(b)(1) based on the amount ($1,000,000) that the defendant demanded from the entertainer. The panel held that the district court's erroneous failure to apply U.S.S.G. § 2X1.1—which provides guidelines for attempt offenses not otherwise covered by a specific offense guideline—was plain, and remanded for resentencing.

## COUNSEL

Carlton F. Gunn (argued), Pasadena, California, for Defendant-Appellant.

Eddie A. Jaurequi (argued) Assistant United States Attorney; L. Ashley Aull, Chief, Criminal Appeals Section; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

BADE, Circuit Judge:

Defendant-Appellant Benjamin Koziol was convicted of attempted extortion under the Hobbs Act, 18 U.S.C. § 1951(a), for threatening to file suit against a well-known

entertainer asserting salacious and scandalous allegations of sexual harassment, sexual assault, and assault and battery if the entertainer did not settle with Koziol for $1,000,000.[1] On appeal, Koziol argues that this court should vacate his conviction and remand with instructions to enter a judgment of acquittal because the threat of litigation, even a baseless and bad faith threat, cannot constitute "wrongful" conduct under the Hobbs Act. Koziol also challenges the sufficiency of the evidence and asserts instructional, evidentiary, and sentencing errors. We affirm his conviction, but remand for resentencing.

## I.

## A.

On December 25, 2015, the manager for a well-known and successful entertainer reviewed advertisements for "erotic massages" on the website Backpage.com. He sent a text message to a number listed in one of these advertisements to set up an appointment. But the masseuse, Jordan Sweet, was not immediately available and the manager did not want to make a later appointment that day.

A few weeks later, on January 10, 2016, the manager sent another text message to Sweet to schedule an appointment. This time Sweet was available immediately,

---

[1] This case arises from Koziol's threats of litigation against a music manager and one of his clients, a well-known singer-songwriter and entertainer. The identities of the manager and the entertainer were subject to a protective order in the district court. Although the parties do not necessarily agree that the protective order remains in effect on appeal, they refer to these individuals by the pseudonyms "Manager" and "Entertainer" and, therefore, we similarly refer to these individuals as the manager and the entertainer.

and she directed the manager to come to her apartment. Once he arrived at Sweet's apartment, the manager disrobed. Sweet directed the manager to lie on a table, covered him with a towel, and proceeded to engage in what the manager described as "light petting." The manager asked Sweet "if there [would be] mutual touching," but Sweet denied the advance and shortly after demanded that the manager leave. The two later exchanged a series of text messages, in which the manager expressed his displeasure with the experience.

A few days later, the manager received a voicemail message on his phone from an attorney, Bobby Saadian. The call, however, was addressed to the entertainer. Saadian alleged that the entertainer had engaged in inappropriate behavior during a massage. When the manager called Saadian in response to the voicemail message, the manager realized that the call was about the manager's encounter with Sweet.

On January 14, 2016, Saadian sent the manager's attorney a letter alleging that the manager "physically and verbally assaulted and battered" Sweet, demanding $250,000 to settle Sweet's claims against the manager, offering the manager "an opportunity to extricate himself from this matter without exposure," and threatening to "promptly file and serve a lawsuit and notify the media of said incident" if the manager did not respond by the next day. In this letter, Sweet's attorney claimed that there was a video that showed the manager at the apartment. On January 26, 2016, the manager entered into a confidential settlement agreement with Sweet, denying the allegations and resolving any potential lawsuit for $225,000. In the settlement agreement, Sweet also released the entertainer from any claims.

Approximately eight months later, in August 2016, Koziol left a voicemail message on the manager's phone and identified himself as Sweet's husband. The manager did not return the call and instead forwarded the message to his attorneys. Shortly after receiving the message, the manager's attorney, Kerry Garvis Wright, called Koziol. Initially, Koziol spoke cryptically, stating that he wanted to speak with the manager "about something that happened a while ago." But soon he spoke more candidly and mentioned the January 10, 2016 massage. Wright suggested that they speak in person; Koziol agreed and said he would contact Wright to schedule a meeting.

But a meeting between Wright and Koziol did not occur. Instead, shortly after the first call, Koziol called again and told Wright he would not meet with her in person. In this second phone conversation Koziol told Wright that he was present the night of the massage, but in the bedroom of the apartment. Koziol also stated that when he left the bedroom and entered the living room, the manager verbally and physically assaulted him. Wright told Koziol that she did not believe him.

Neither the manager nor Wright heard from Koziol for several months after the August 2016 calls. Then, on December 28, 2016, Sherwin Arzani, an attorney representing Koziol, delivered a letter to an attorney who previously represented the entertainer. An identical letter arrived two days later at Wright's firm. In that letter, Koziol's attorney accused the entertainer—not the manager—of physically assaulting and battering Koziol as he protected Sweet from "unwanted physical advances" during the January 2016 massage. He also warned of the possibility of legal action if the entertainer failed to respond to the letter.

In response, Wright sent a letter to Arzani, stating that her firm represented the manager, not the entertainer, and that it was the manager who had been at Sweet's apartment on the night in question. Wright denounced Koziol's allegations as "a complete and utter fabrication." Wright also threatened legal action against both Koziol and Sweet if Koziol persisted in his attempts to extract a further settlement from the manager. Arzani did not respond.

The entertainer and the manager did not hear from Koziol again until October 2017—about ten months after the last contact with Koziol's then-attorney, Arzani, and about twenty-one months after the massage incident. Koziol sent the manager an email trying to contact the entertainer or the entertainer's attorney. The manager forwarded the email to the entertainer's attorney, Reid Hunter, who soon responded.

On October 17, 2017, Koziol replied to Hunter in a lengthy email in which he accused the entertainer of contacting Sweet for a massage in December 2015. The email contained a bevy of additional allegations against the entertainer, including that: (1) he attempted to touch Sweet several times during the massage, (2) he cursed at Sweet and called her "a f[---]ing tease" when she refused his advances, (3) when Koziol attempted to intervene, the entertainer punched him in the face, knocking him unconscious, and (4) the entertainer continued to text Sweet following the encounter, threatening to report Sweet to her apartment management for her illicit business. Koziol further claimed he had a video of the entertainer at the building on the night of the incident, as well as a photograph of his injuries from

the entertainer punching him.[2]  Koziol concluded with the following demand:

> I am seeking $1,000,000 in damages on or before Nov 1st 2017.  I am also open to a structured settlement.  If I don't receive payment by this date, I am prepared to promptly file my complaint and supporting documents with the court. THIS LETTER IS FOR SETTLEMENT PURPOSES ONLY!

Hunter responded to Koziol's email with a series of questions to probe Koziol's claims.  The two continued to exchange email messages, with Hunter ultimately requesting an extension from Koziol's original November 1, 2017 deadline.  Koziol, however, denounced the request as a "stahl [sic] tactic" and indicated that "TIME IS OF THE ESSENCE!"  Nevertheless, he offered the entertainer a reprieve of one week to consider the offer.  Koziol threatened that he would file a complaint with his allegations on November 8, 2017 if he did not receive a settlement. After speaking to the entertainer, Hunter sent an email to Koziol on November 3, 2017 and asked to speak to Koziol by phone to discuss some additional questions.  But Koziol refused to speak with Hunter on the phone.  Instead, he sent another email and reiterated his demand to settle for

---

[2] The district court admitted into evidence Koziol's October 17, 2017 email to Hunter, in which he claimed that he had a video of the entertainer at the apartment building on the night of the January 2016 massage.  Koziol did not include the video in his email to Hunter.  In addition, the government presented testimony that, despite attempts to obtain a copy of the alleged video, the FBI was unable to do so. Moreover, Koziol did not present any video evidence at the trial and later, at his sentencing hearing, admitted that he never had a video of the entertainer and that he lied when he claimed that he did.

$1,000,000, which would "NOT BE RENEWED AFTER" November 7, 2017.

When the deadline came, Hunter replied and rejected Koziol's offer to settle as "ridiculous." Hunter further stated that the entertainer would take legal action against Koziol should he follow through on his threat to file a lawsuit. In reply, Koziol stated that the entertainer's threat of legal action "d[id] not intimidate or deter [him] at all" because he had "no money or assets to go after." Because the entertainer failed to respond, Koziol stated he had "no option other than to move forward with a jury trial." However, Koziol gave the entertainer one last chance to reconsider or counter his settlement offer "ASAP."

On November 10, 2017, Lynn Neils, another of the entertainer's attorneys—and a former federal prosecutor—contacted Koziol on the entertainer's behalf in a letter delivered to Koziol's email account. In that letter, Neils asserted that Koziol's conduct violated a litany of federal and state criminal statutes, including the Hobbs Act. She also advised Koziol that metadata of the photograph purportedly showing Koziol's injuries from the assault "reveals that this photograph was taken nearly a year later—proving that you are utterly lying about the facts."[3] Undeterred, Koziol stated that he would "be moving immediately forward to file [his] lawsuit within the next few days." But, once more, he offered the entertainer the chance

---

[3] The government introduced evidence at trial establishing that the photograph was taken in December 2016, nearly a year after the alleged assault. Koziol does not dispute this evidence on appeal and acknowledges that metadata established that the photograph was taken in December 2016.

to settle if he had "a change of heart."  The entertainer did not settle, and Koziol never filed his lawsuit.

## B.

Nonetheless, legal action soon commenced.  On January 19, 2018, a federal grand jury in the Central District of California indicted Koziol for attempted extortion under the Hobbs Act, 18 U.S.C. § 1951(a).  The indictment alleged that Koziol "knowingly attempted to obtain property consisting of approximately $1,000,000 from victim Entertainer, with the victim Entertainer's consent, induced by the wrongful use of fear, by threatening to publish false criminal allegations against victim Entertainer by filing a public lawsuit, if the victim Entertainer refused to transfer $1,000,000 to defendant Koziol."

At trial, the prosecution called several witnesses, including the manager, the entertainer, and attorneys Wright and Hunter.  On June 1, 2018, the jury found Koziol guilty of attempted extortion.  At the close of the government's case, and again after the verdict, Koziol moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c); the court reserved ruling on the trial motion and denied the post-trial motion.

The district court sentenced Koziol to seventy months' imprisonment to run consecutively to his California state conviction in an unrelated matter.  Koziol filed a timely notice of appeal, *see* Fed. R. App. P. 4(b)(1), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Koziol first argues that his conviction must be reversed because the threat of litigation, even when "frivolous,

meritless, or made in bad faith," can never constitute "wrongful" conduct under the Hobbs Act, 18 U.S.C. § 1951. Koziol made the same argument in his post-trial motion for acquittal, which the district court denied, concluding that Koziol's "threatened litigation was entirely sham in nature and made for an improper purpose," and thus "wrongful" under the Hobbs Act.

When the denial of a motion for acquittal turns on the district court's interpretation of a statute, we review the decision de novo. *See United States v. Lo*, 839 F.3d 777, 783 (9th Cir. 2016). We conclude that there is no statutory, constitutional, or policy basis to support Koziol's argument that threats of sham litigation are categorically excluded from criminal liability under the Hobbs Act.[4] Therefore, we reject Koziol's argument and affirm the denial of his motion for acquittal.

## A.

The Hobbs Act imposes criminal liability on those who "obstruct[], delay[], or affect[] commerce . . . by robbery or extortion." 18 U.S.C. § 1951(a). Under the statute, "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). Although Koziol correctly observes that the statute does not define "wrongful," he fails to acknowledge that the term has been defined by the

---

[4] We have previously held that the Hobbs Act does not impose liability for threats of litigation that do *not* rise to the level of a sham. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006). But we have not previously addressed whether the Hobbs Act applies to threats of sham litigation. In Section II.B, we address the definition of sham litigation and whether Koziol's threats rise to that level.

Supreme Court and this court.   We conclude that the statutory interpretation of the term "wrongful," as applied in our case law, extends to Koziol's threat of sham litigation.

**1.**

We have stated that *United States v. Enmons*, 410 U.S. 396 (1973), "is the starting point for the interpretation of 'wrongful' in the extortion statute."   *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014).   In *Enmons*, the Supreme Court explained that obtaining property is "wrongful" under the Hobbs Act if "the alleged extortionist has no lawful claim to that property."   410 U.S. at 400. There, the Court concluded that the use of threats of physical force or violence was not "wrongful" under the Hobbs Act because the defendants—officials and members in a labor union—sought "legitimate labor ends," and thus, had a lawful claim to the things of value they demanded, including higher wages and benefits in return for genuine services.[5]  *Id.* at 397–401.

In *United States v. Dischner*, we applied this definition of "wrongful" to threats of economic loss and reiterated that "[o]btaining property is generally 'wrongful' if the alleged extortionist has no lawful claim to that property."[6]  974 F.2d

---

[5] In *Enmons*, the Court relied, in part, on the legislative framework of the Hobbs Act to conclude that it did not apply to the use of force to obtain "legitimate labor ends."   410 U.S. at 401.

[6] Conversely, we have explained that threats of economic harm to obtain property are generally not considered "wrongful" when "the alleged extortioner *has a legitimate claim to the property* obtained through such threats."  *Levitt*, 765 F.3d at 1130–31 (emphasis added) (citation omitted); *see id.* at 1131–32 ("[W]here the defendant has a claim of right to property and exerts economic pressure to obtain that

1502, 1516 (9th Cir. 1992) (citing *Enmons*, 410 U.S. at 400), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (en banc). We determined that the defendants' conduct was wrongful because the defendants had no lawful right to demand payments in the form of kickbacks and extortionate contracts. *Id.* at 1507–08, 1515–18. Other circuits too have concluded that economic threats are "wrongful" under the Hobbs Act if the alleged extortionist does not have a lawful claim to the property demanded. *See, e.g.*, *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989) ("We therefore hold that for purposes of the Hobbs Act, the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property." (footnotes omitted)); *see also United States v. Tobin*, 155 F.3d 636, 640–41 (3d Cir. 1998) (concluding that economic threats and other harassment were "within the purview of the Hobbs Act" because the victims "had a preexisting right to be free" from such threats).

We have also addressed whether the means the defendant employed to demand the property may be the basis for wrongfulness under the Hobbs Act. In *United States v. Daane*, we concluded that use of inherently wrongful means (e.g., physical violence outside the labor context) could support a Hobbs Act extortion charge regardless of whether the defendant had a claim to the property demanded. 475 F.3d 1114, 1119–20 (9th Cir. 2007). And in *United States v. Villalobos*, we held that even nonviolent means that are not inherently wrongful could support an extortion charge if they were wrongful under the circumstances.

property, that conduct is not extortion and no violation of the Hobbs Act has occurred." (quoting *Rennell v. Rowe*, 635 F.3d 1008, 1011, 1012 (7th Cir. 2011); other citation omitted)).

748 F.3d 953, 957–58 (9th Cir. 2014) (concluding that a lawyer's threats that his client would "cooperate with, or alternatively impede," an ongoing investigation depending upon whether the extortion victim paid him were unlawful (i.e., endeavoring to obstruct justice), and therefore wrongful under the circumstances).

We have described this as a "means-ends framework," which recognizes "that certain 'means' to obtain property are 'wrongful' under the Hobbs Act without regard to the 'ends' sought by the defendant." *Id.* at 957 (citing *Daane*, 475 F.3d at 1119–20). We noted that the First Circuit adopted a similar approach in *Sturm*, where it reasoned "that extortion cases based on force or violence generally involve wrongful 'means,' while extortion cases based on economic fear typically involve only allegations of wrongful 'ends' (i.e. the defendant does not have a lawful claim to the property demanded)." *Id.* at 957 n.3 (quoting *Sturm*, 870 F.2d at 773). Therefore, we must consider whether the means Koziol used in his attempt to obtain the property (threats of sham litigation) were wrongful under the circumstances,[7] or whether the ends were wrongful because he had no lawful claim to the property he demanded.

---

[7] Because *Villalobos* requires that we examine the circumstances to determine whether the means used to obtain property are wrongful, even when nonviolent means that are not inherently wrongful are employed, 748 F.3d at 956–57, we necessarily reject Koziol's argument that threats of sham litigation are categorically excluded from the term "wrongful" under the Hobbs Act.

**2.**

The government alleged that, after initially asserting the same claims against the manager,[8] Koziol threatened to file a lawsuit publicizing baseless allegations that could damage the entertainer's reputation and livelihood in an attempt to extort $1,000,000 from the entertainer. The government asserted that Koziol used falsified evidence to show his alleged injuries and that he lied about the existence of other evidence to support his claims. The government also alleged that Koziol knew that his allegations against the entertainer were false and that he did not have a lawful claim to the property he demanded. The government's allegations, if supported by sufficient evidence,[9] establish that Koziol knew he had no lawful claim to the property he demanded. *See Tobin*, 155 F.3d at 640–41 (concluding that defendant "did not have the right to seek to enforce her alleged oral contract through a campaign of telephone terrorism," that included—among other things—threats of litigation alleging sexual harassment against the extortion victim and that her actions were "within the purview of the Hobbs Act").

We conclude that the circumstances alleged in this case establish that Koziol's conduct went far beyond threatening to file a lawsuit based on weak claims and that it fell well outside the bounds of legitimate pre-litigation settlement

---

[8] After the manager negotiated a settlement with Sweet, Koziol accused the manager of physically and verbally assaulting him on the night of the massage. Koziol did not mention the entertainer in these allegations. The manager's attorney refused any attempts to extract additional money from her client, and Koziol later changed his story to accuse the entertainer.

[9] We address Koziol's challenge to the sufficiency of the evidence to support his conviction in Section III.

demands.  Following *Enmons* and *Dischner*, we hold that threats of sham litigation, which are made to obtain property to which the defendant knows he has no lawful claim, are "wrongful" under the Hobbs Act.[10]  Applying the "means-ends framework" of *Villalobos*, we need not decide whether the means that Koziol employed in his threats (baseless threats of sham litigation using falsified evidence and deceit) were "wrongful" under the Hobbs Act because he sought to obtain money to which he knew he had no lawful claim and, thus, the ends were "wrongful."  *See Villalobos*, 748 F.3d at 956–57 & n.3.  We therefore conclude that Koziol's threats of sham litigation were "wrongful" under the Hobbs Act.

## B.

Koziol also argues that, even if we do not accept his argument that threats of sham litigation can never establish liability under the Hobbs Act, we should nonetheless vacate his conviction because his threatened litigation did not rise

---

[10] In *Sturm*, the First Circuit held that the term "wrongful" in the Hobbs Act "requires the government to prove, in cases involving extortion based on economic fear, that the defendant knew that he was not legally entitled to the property that he received."  870 F.2d at 774.  But we have not yet imposed this requirement.  *See United States v. Greer*, 640 F.3d 1011, 1019 n.4 (9th Cir. 2011) ("Because the district court's instructions satisfied the First Circuit's requirement in *Sturm*, we need not decide whether to adopt *Sturm* as the law of this circuit." (citation omitted)); *Dischner*, 974 F.2d at 1515 ("[W]e need not decide whether the government must prove that the defendant knew he had no entitlement.").  In this case, the district court instructed the jury that a threat is "wrongful" under the Hobbs Act "if the defendant knew he was not entitled to obtain the property," and the parties do not dispute this knowledge requirement.  Therefore, we do not decide whether the Hobbs Act imposes liability absent proof that the defendant knew he was not entitled to the property.

to the level of a sham and should thus be immune from liability.   Koziol bases this argument on the *Noerr-Pennington* doctrine, which is a rule of statutory construction that requires courts to construe statutes to avoid burdening conduct that implicates the protections of the Petition Clause of the First Amendment.[11]   *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931–32 (9th Cir. 2006).  The Petition Clause protects "the right of the people . . . to petition the government for a redress of grievances," *id.* at 929 (quoting U.S. Const. amend. I), and "[u]nder the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct," *id.* (citation omitted).

The constitutional right to petition includes the right of access to the courts and therefore most litigation activities (including pre-suit demands) are immunized from statutory liability.  *Id.* at 929, 933–36.  However, "neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them." *Id.* at 932.  Indeed, the "established sham exception . . . provides . . . protection against baseless claims asserted in prelitigation settlement letters."  *Id.* at 936 (citing *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993); other citation omitted).

---

[11] "The *Noerr-Pennington* doctrine arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment Petition Clause."  *Sosa*, 437 F.3d at 929 (discussing *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)).  The Court has since applied this doctrine "outside the antitrust field."  *Id.* at 930.

Litigation is a sham "where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful." *Id.* at 938 (citing *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998)). A lawsuit is objectively baseless where "no reasonable litigant could realistically expect success on the merits." *Pro. Real Est. Invs.*, 508 U.S. at 60. If this first prong of the sham exception (objective baselessness) is satisfied, then the court must determine whether the defendant had an improper motive. *See Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 352–53 (9th Cir. 2014). "[R]equiring *both* objective baselessness and an improper motive . . . overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution." *Sosa*, 437 F.3d at 934 (citation omitted).

Koziol acknowledges that the *Noerr-Pennington* doctrine does not protect sham litigation activities, including threats of sham litigation. However, he argues that the sham exception does not apply to his litigation threats because he was not acting with an improper motive; instead, he sought "the outcome of a successful lawsuit []—a cash settlement." But as the government notes, despite several threats to file a lawsuit against the entertainer, Koziol never filed his suit. Koziol's failure to file the threatened lawsuit supports the second prong of the sham exception (improper motive) because it provides evidence from which a reasonable jury could conclude that Koziol hoped to enforce his claim "through the *threat* of litigation rather than through actual litigation," and therefore sought to achieve his "aim[s] through the litigation *process* rather than through the *result* of that process."[12] *See Rock River Commc'ns*, 745 F.3d

---

[12] We are not suggesting that by filing his threatened sham complaint, Koziol could have automatically prevented the government

at 353 (citation omitted) (concluding that a reasonable jury could find that the second prong of sham exception was met where defendant sent cease-and-desist letters but failed to initiate litigation, which suggested defendant hoped to enforce its claim through the threat of litigation rather than actual litigation).

Koziol attempts to distinguish *Rock River Communications* by arguing that he did not file a lawsuit because the entertainer's attorneys threatened him with criminal and civil liability. Koziol points to a November 10, 2017 letter from Neils, but on November 27, 2017, Koziol responded to that letter and, apparently undeterred, repeated his threats to file suit "within the next few days" unless the entertainer agreed to settle. And Koziol responded to earlier threats of legal action from another of the entertainer's attorneys (Hunter) by stating that such threats "d[id] not intimidate or deter [him] at all" because he had "no money or assets to go after." Thus, the jury could reasonably conclude that Koziol was not intimidated by the attorneys' threats of liability and that those threats do not explain his failure to file his lawsuit. *See Rock River Commc'ns*,

from proving improper motive. Indeed, extortionists are not free simply to file a complaint and thus don the protective mantle of *Noerr-Pennington* immunity. *See Kottle*, 146 F.3d at 1060 (holding that "litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy'" (quoting *Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir. 1993); other citation omitted)). Koziol's falsified evidence, if included in a filed complaint or otherwise submitted to the court, would certainly qualify as intentional misrepresentations to the court. And even if Koziol had filed a complaint omitting the falsified evidence, the incongruity between his settlement demands and the complaint would be probative evidence of sham litigation as well, especially when considered with the evidence that Koziol knew he had no lawful claim to the settlement he demanded, as discussed below.

745 F.3d at 352–53 (explaining that whether the sham exception to the *Noerr-Pennington* doctrine applies is a question of fact).

Indeed, as discussed more fully below, Koziol fabricated evidence, lied about the existence of evidence, and knew that his claims were baseless, all of which further demonstrates that his threats to file a lawsuit were made with an improper motive. From this evidence, we conclude that Koziol knew that his threatened lawsuit could never prove fruitful if brought before a jury, which is why he attempted to intimidate the entertainer into a settlement based on admittedly falsified evidence and an implied threat that scandalous allegations in a publicly filed lawsuit would irrevocably damage the entertainer's reputation and livelihood.

Therefore, we reject Koziol's argument that his litigation threats did not rise to the level of a sham as a matter of law and conclude that the *Noerr-Pennington* doctrine did not immunize Koziol's threats of sham litigation.

## C.

Finally, Koziol argues that "a passing comment," in one of our cases, *First Pacific Bancorp, Inc. v. Bro*, 847 F.2d 542, 547 (9th Cir. 1988), which he characterizes as "dictum," and statements in cases from other circuits establish that threats of sham litigation can never constitute "wrongful" conduct under the Hobbs Act. However, our review of these cases establishes that they do not support the broad proposition that threats of sham litigation should be categorically excluded from criminal liability under the Hobbs Act, and that they are distinguishable and therefore not persuasive in this case. We first address Koziol's characterization of our decision in *First Pacific Bancorp*,

which is binding precedent in this court, and then we consider his reliance on non-binding decisions from other circuits.

**1.**

In *First Pacific Bancorp*, a bank brought a claim under § 1964 of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968,[13] against its shareholders who had solicited proxies in favor of an alternative slate of candidates for the board of directors and had taken steps to initiate a shareholders' derivative suit. 847 F.2d at 543–44. The shareholders delivered a draft complaint to the bank's board of directors, but they did not file or serve the complaint and they did not make any statements to obtain money or property from the bank during the proxy solicitation. *Id.* at 544. On appeal, we affirmed the district court's entry of summary judgment in favor of the shareholders and rejected the bank's claims that the proposed shareholder derivative suit and alleged threats to a bank director were acts of extortion under RICO. *Id.* at 547.

We concluded that because the proposed suit was "not a catalyst for any corporate action," it therefore was not an

---

[13] RICO addresses "racketeering activity," which it defines to "encompass dozens of state and federal offenses, known in RICO parlance as predicates." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2096 (2016). "A predicate offense implicates RICO when it is part of a 'pattern of racketeering activity'—a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *Id.* at 2096–97. In § 1962, RICO prohibits certain activities in relation to an enterprise. *Id.* at 2096. Section 1964(c) "create[d] a private civil cause of action that allows '[a]ny person injured in his business or property by reason of a violation of section 1962' to sue in federal district court and recover treble damages, costs, and attorney's fees." *Id.* at 2097 (second alteration in original) (quoting § 1964(c)).

extortionate act and did not otherwise qualify as a predicate offense under RICO. *Id.* We also determined that the alleged threats were insufficient because "[e]xtortion by threat requires 'fear,'" but the bank did not claim that the alleged threats caused fear and did not identify any corporate action that the imposition of fear might have been intended to compel. *Id.* (citing *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984)). "Absent such support, the allegation of extortion collapses." *Id.* Thus, we rejected the bank's civil RICO claims because the bank's allegations of extortion were insufficient. We did not make any broad or general statements that threats of litigation, even threats of sham litigation, can never establish criminal liability under the Hobbs Act.

Koziol asserts that other circuits have read *First Pacific Bancorp* "as adopting the more general proposition that no threat of litigation, regardless of merit or bad faith, is extortion." But even if we accept Koziol's characterization of these cases, the conclusion that threats of sham litigation can never amount to extortion is simply not supported by our decision in *First Pacific Bancorp*.

**2.**

Perhaps recognizing that our decision in *First Pacific Bancorp* does not support his argument, Koziol relies primarily on cases from other circuits to argue that threats of sham litigation can never constitute "wrongful" conduct under the Hobbs Act. Koziol cites *Kim v. Kimm*, 884 F.3d 98, 104–05 (2d Cir. 2018); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003); *United States v. Pendergraft*, 297 F.3d 1198, 1205–08 (11th Cir. 2002); *Vemco, Inc. v. Camardella*, 23 F.3d 129,

134 (6th Cir. 1994); and *I.S. Joseph Co.*, 751 F.2d at 267–68.

Setting aside *Pendergraft* momentarily, all these cases involve civil RICO claims and parties involved in business disputes who had been or were at that time involved in litigation apart from the civil RICO suit. *See Kim*, 884 F.3d at 100–01; *Snow*, 833 F.3d at 518–20; *Deck*, 349 F.3d at 1256, 1258; *Vemco*, 23 F.3d at 132–33; *I.S. Joseph Co.*, 751 F.2d at 266–67. There are significant differences between these cases, dealing with civil RICO claims, and the criminal charges at issue in this case. As the Supreme Court has explained: "The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2106 (2016) (citation omitted).

Indeed, in these cases the courts concluded that RICO does not authorize suits by private parties asserting claims against business or litigation adversaries, based on litigation activities, and seeking treble damages, costs, and attorneys' fees. *See Kim*, 884 F.3d at 104 ("'[I]f litigation activity were adequate to state a claim under RICO, every unsuccessful lawsuit could spawn a retaliatory action,' which 'would inundate the federal courts with procedurally complex RICO pleadings.'" (citations omitted)); *Snow*, 833 F.3d at 525 (explaining that litigation tactics cannot be a predicate for a civil RICO claim); *Deck*, 349 F.3d at 1258 ("[R]ecognizing abusive litigation as a form of extortion would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim."); *see also Vemco, Inc.*, 23 F.3d at 134; *I.S. Joseph Co.*, 751 F.2d at 267.

In rejecting RICO liability based on litigation activities, these courts expressed policy concerns relating to ensuring access to the courts, promoting finality, and avoiding collateral litigation.  *See Kim*, 884 F.3d at 104 (explaining that permitting RICO suits based on prior litigation activities would "engender wasteful satellite litigation," "erode the principles undergirding the doctrines of res judicata and collateral estoppel," and "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts" because "pleading[s] and correspondence in an unsuccessful lawsuit could lead to drastic RICO liability" (citations omitted)); *see also Snow*, 833 F.3d at 525; *Deck*, 349 F.3d at 1258; *I.S. Joseph Co.*, 751 F.2d at 267.

These cases turn on the scope of civil liability under RICO and related policy concerns, but they do not address the issue presented in this case:  whether threats of sham litigation can establish criminal liability under the Hobbs Act.  Furthermore, the policy concerns asserted in these cases are not implicated when a defendant, who has no relationship with his alleged extortion victim, including any prior or pending litigation, threatens sham litigation to obtain property to which he knows he has no lawful claim.  *See Rickards v. Canine Eye Registration Found.*, 783 F.2d 1329, 1334 (9th Cir. 1986) ("This kind of litigation deserves all the chilling effect the law allows.").  Therefore, we reject Koziol's argument that these civil RICO cases from other circuits establish that threats of sham litigation can never constitute extortion under the Hobbs Act.

Similarly, *Pendergraft* turned on policy considerations that do not apply in this case.  In *Pendergraft*, the defendants were convicted of attempted extortion in violation of the Hobbs Act (as well as several other offenses) based on

threats to amend their complaint in a pending civil suit to add a claim for damages against a county government, and based on their filing of sworn declarations with false statements. 297 F.3d at 1200–02. The defendants argued to the Eleventh Circuit, in part, that a threat to file a lawsuit could never amount to extortion. *Id.* at 1204. The court vacated the conviction after reaching a "narrow" holding that this threat of suit against a county government was not wrongful, even if made in bad faith and supported by false affidavits. *Id.* at 1208.

Like the courts addressing the civil RICO claims, the Eleventh Circuit's reasoning in *Pendergraft* was based on policy concerns related to access to the courts. *Id.* at 1206. The court stated that "[a] threat to litigate, by itself, is not necessarily 'wrongful' within the meaning of the Hobbs Act." *Id.* And it noted that our legal system encourages parties "to resort to courts for the redress of wrongs and the enforcement of rights." *Id.* (citations omitted). The court then addressed the fabrication of evidence (filing sworn affidavits with false information in the underlying civil case) and stated that "the rigors of cross-examination and the penalty of perjury sufficiently protect the reliability of witnesses." *Id.* at 1207 (citations omitted).

Therefore, the court concluded that "[c]riminalizing false testimony via the Hobbs Act would expand the scope of witness liability," which the court described as "unsettling" because it did "not believe that Congress intended to expand the scope of witness liability in this way."[14] *Id.* Thus, like the civil RICO cases, the court in

---

[14] One of the defendants was convicted of perjury and making false statements to the FBI and on appeal those convictions were affirmed. *Pendergraft*, 297 F.3d at 1200.

*Pendergraft* noted its concern that "[a]llowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another. The reality is that litigating parties often accuse each other of bad faith. The prospect of such civil cases ending as criminal prosecutions gives us pause." *Id.*

But as we previously explained, these policy concerns—promoting access to the courts and avoiding collateral litigation—are not implicated by threats of sham litigation.[15] Therefore, we conclude that neither the narrow holding of *Pendergraft* nor its reasoning apply to the situation presented here—liability for extortion under the Hobbs Act that is not based on litigation tactics or activities in prior or continuing civil litigation, but instead is based on a threat of sham litigation to obtain property to which the defendant knows he has no lawful claim.

Even if we were to read *Pendergraft* as Koziol urges, we would conclude that the decision in that case must be viewed as an outlier and not in accord with other criminal cases under the Hobbs Act. *See United States v. Cuya*, 724 F. App'x 720, 724 (11th Cir. 2018) (per curiam) (distinguishing *Pendergraft* and concluding that "threats of bogus lawsuits" and "settlement" demands—predicated on a demand for

---

[15] These cases also suggest that the victim of bad faith litigation tactics may have remedies and protections in state tort law through claims of malicious prosecution, wrongful use of civil proceedings, and abuse of process, and that wrongful litigation conduct will be deterred by the penalties for perjury, obstruction of justice, and witness tampering. *See Snow*, 833 F.3d at 525; *Pendergraft*, 297 F.3d at 1207–08; *I.S. Joseph Co.*, 751 F.2d at 267. But these remedies and penalties will rarely, if ever, protect the victim of extortionate threats of sham litigation when, as in this case, the sham lawsuit is threatened but not filed.

payment of late fees for purchase orders the defendant fabricated—were "wrongful" under the Hobbs Act);[16] *Tobin*, 155 F.3d at 640–41 (affirming conviction for extortion under the Hobbs Act based, in part, on threats to file an unrelated and false lawsuit alleging sexual harassment in an attempt to enforce an alleged oral contract); *Sturm*, 870 F.2d at 774 (concluding that extortion under the Hobbs Act requires the government to prove the defendant knew he was not legally entitled to the demanded property and using the example of a good faith threat of litigation to explain that, in the absence of such knowledge, it would be unjust to convict a defendant of extortion). Therefore, we reject Koziol's argument that these cases from other circuits establish that threats of sham litigation cannot constitute extortion under the Hobbs Act.

## D.

After reviewing the plain language of the statute, the case law interpreting the term "wrongful," and the reasoning of other courts, we hold that threats of sham litigation are not categorically excluded from criminal liability for extortion under the Hobbs Act. Nor are such threats immunized by the *Noerr-Pennington* doctrine. *See Sosa*, 437 F.3d at 932. Instead, we must consider the circumstances of such threats to determine whether the defendant used wrongful means or

---

[16] Although *Cuya* is an unpublished decision, it is notable because the Eleventh Circuit concluded that threats of sham litigation, which were very similar to the threats in this case, were "wrongful" and extortionate under the Hobbs Act. 724 F. App'x at 724. The court rejected the defendant's argument, based on *Pendergraft*, that threats of litigation are legally insufficient to support his conviction and concluded that its earlier decision in *Pendergraft* "[did] not apply." *Id.*

whether he sought to obtain property to which he knew he had no lawful claim and, thus, the ends were wrongful.

In this case, Koziol's threats of sham litigation—in which he produced falsified evidence and lied about the existence of evidence, initially targeted another victim with the same threats, and knew he had no lawful claim against his victim—sought "wrongful" ends and thus were within the scope of Hobbs Act. Therefore, we conclude that the district court correctly denied Koziol's motion for acquittal.

## III.

Koziol also argues that, even if the threat of sham litigation can constitute "wrongful" conduct under the Hobbs Act, the evidence was insufficient to support his conviction for extortion under § 1951(a). Although Koziol conceded at trial that the entertainer was not the massage customer and was not present during the incident at issue, he argues that no rational jury could have found that he *knew* that the entertainer was not the massage customer and, thus, that he *knew* he had no lawful claim to the money he demanded from the entertainer.

When reviewing the sufficiency of the evidence, we ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); other citation omitted). When the evidence presents "conflicting inferences," we "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and [we] must defer to that resolution." *Id.* at 1164 (quoting *Jackson*, 443 U.S. at 326; other citation omitted).

Here, there was ample evidence at trial from which a rational jury could conclude that Koziol knew his allegations were baseless and that he had no right to obtain any money from the entertainer.  As an initial matter, the uncontested evidence at trial established that it was the manager, not the entertainer, who was present at Sweet's apartment on the night of the massage.  Several months after the manager negotiated a settlement with Koziol's wife, Sweet, Koziol accused the manager of "verbally and physically" assaulting him, even though Koziol was not mentioned in the detailed demand letter that Saadian, Sweet's attorney, previously sent to Wright, the manager's attorney.  When Koziol made these allegations against the manager, Koziol was aware that the manager had settled with Sweet and he claimed that Saadian had also represented him.  After Wright refused any attempts to extract additional money from her client, Koziol changed his story to accuse the entertainer.  He later falsely claimed that he had "never accused [the manager] of anything!"  And in his threats to sue the entertainer, Koziol contradicted his earlier allegations and stated that the manager "was never at my apartment and has nothing to do with this case."

Moreover, the uncontested evidence also established the entertainer had never even met Koziol or Sweet. Nonetheless, despite his earlier claims that the manager was the massage customer who assaulted him, Koziol changed his story and claimed that he confronted the entertainer at the apartment on the night of the massage and spoke to him, asserted that "by the look on [the entertainer's] face" he was "obviously surprised to see" Koziol, and accused the entertainer of punching him in the face and knocking him unconscious.  Koziol also claimed that he "immediately recognized" the entertainer when he searched for him on the internet.  From this evidence, a rational jury could find that Koziol knew that the manager, not the entertainer, was the

massage customer and that Koziol knew he did not have a claim against the entertainer.

Koziol also used falsified evidence (the photograph of his purported injuries) to bolster his threats against the entertainer, he lied about the existence of evidence that supported his claims (the video that purportedly showed the entertainer at Sweet's apartment the night of the massage). And in the demand letter that Koziol's wife sent to the manager through her attorney, she also claimed that she had a video showing the massage customer at the apartment—but stated that the video showed the manager at the apartment. Again, from this evidence, a rational jury could conclude that Koziol knew he had no lawful claim against the entertainer.

In addition, Koziol asserted to the entertainer's attorney that he had "plenty of evidence and a witness to prove [his] allegations" and that he would "be calling [his] wife to testify." Yet Koziol sought to keep Sweet from talking about the incident, even though she was one of the entertainer's alleged victims and Koziol's only witness. The jury heard a post-arrest recording in which Koziol asked someone to tell Sweet "not to talk to anybody, and make sure she's not talking over the phone" as she "can really f[---] me in anything she says, I don't think she realizes anything she says can." A rational jury could conclude that this evidence established that Koziol believed Sweet's statements would contradict his claims and reveal that he knew he had no lawful claim against the entertainer. The jury could have also inferred that Koziol's failure to file suit despite his assertion that he had "plenty of evidence" indicated that he knew he had no legitimate claim against the entertainer.

Finally, Koziol refused to meet with the manager's attorney in person, and he refused to speak with the

entertainer's attorneys on the telephone. He communicated with the entertainer's attorneys through an email address and phone that he had obtained four days before he first threatened to sue the entertainer. The phone number that Koziol provided to the entertainer's attorneys was registered to "John Doe" and was associated with a non-existent address. From this evidence, a rational jury could conclude that Koziol was trying to make it difficult to locate him because he knew his allegations against entertainer were baseless and he was acting in bad faith.

Koziol, in contrast, contends that the evidence at trial, even in the light most favorable to the government, precluded the jury from finding that he did not honestly believe that the entertainer attacked him. He argues that: (1) the initial voicemail from Sweet's attorney to the manager, left four days after the January 2016 massage, referenced the entertainer, rather than the manager, and Sweet's attorney sent a subsequent email addressed to the entertainer, thus establishing that Koziol and Sweet believed the entertainer to be the perpetrator from the start; (2) the settlement with the manager was negotiated quickly with minimal resistance, and it included the entertainer in the list of released individuals, suggesting a cover-up; (3) Koziol's later demands through his attorney referenced the entertainer, rather than the manager; and (4) Koziol's claim that he had a video showing the entertainer at the apartment made sense only if he truly believed that the entertainer was the individual at the apartment.

But Koziol's arguments ignore the requirement that this court construe the evidence in the light most favorable to the government. First, even if the evidence would support the conclusion that Koziol and Sweet initially believed that the entertainer was the massage customer, the evidence also

established that Sweet entered into a substantial settlement with the manager, and Koziol alleged that the manager assaulted him. Therefore, a rational jury could conclude that even if Sweet and Koziol initially believed that the entertainer was the massage customer, they learned that it was the manager long before making the same allegations against the entertainer.

Second, while a rational jury could conceivably interpret the manager's quick settlement and the release of claims against the entertainer to indicate a cover-up, we must again view the evidence in the light most favorable to the government. In that light, a rational jury could accept the manager's testimony that the settlement reflected "a business decision" to avoid ruining his own career, and that the settlement included a release of any claims against the entertainer because the initial communications from Sweet's attorney referred to the entertainer and the manager wanted to prevent any further false accusations against his client, the entertainer.

Third, although Koziol's later demands all referenced the entertainer rather than the manager, he made those demands only after accusing the manager of assaulting him and only after the manager's attorney rejected Koziol's attempts to obtain a second settlement for claims related to the January 2016 massage. Thus, viewing this evidence in the light most favorable to the government, a rational jury could conclude that after Koziol's attempts to extract a second settlement from the manager failed, he changed his story and targeted the entertainer, demonstrating that he knew his claim against the entertainer was baseless.

Finally, a rational jury could conclude that Koziol's false claim that he had a video of the entertainer at the apartment the night of the massage did not establish that Koziol

believed the entertainer was the massage customer. Instead, this evidence could rationally show that—as Koziol's attorney argued with respect to the falsified photograph—Koziol's bluffs were simply "very unsophisticated." In the light most favorable to the government, a rational jury could conclude that Koziol was just not very adept in his extortion attempts, rather than inferring that Koziol must have believed that the entertainer was the massage customer.

In sum, when viewed in the light most favorable to the government, the evidence was more than sufficient for the jury to conclude beyond a reasonable doubt that Koziol knew his claims against the entertainer were baseless and that he had no right to demand money from the entertainer. Therefore, we conclude that the evidence was sufficient to support Koziol's conviction.

## IV.

Koziol also argues that the district court erred in instructing the jury. We "review the formulation of jury instructions for abuse of discretion, but review de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case." *United States v. Liew*, 856 F.3d 585, 595–96 (9th Cir. 2017) (citing *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc)). Thus, we must determine "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Id.* at 596 (quoting *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010)).

A party must state with adequate specificity his grounds for an objection to an instruction. Fed. R. Crim. P. 30(d); *Hofus*, 598 F.3d at 1175. When the defendant fails to request an instruction or fails to offer an objection to a proposed instruction, we review only for plain error. *Hofus*, 598 F.3d

at 1175; *United States v. Conti*, 804 F.3d 977, 981 (9th Cir. 2015). "Under the plain error standard, relief is warranted where the district court committed (1) error that (2) is plain; (3) 'affected substantial rights;' and (4) 'seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Vargem*, 747 F.3d 724, 728 (9th Cir. 2014) (quoting *United States v. Teague*, 722 F.3d 1187, 1190 (9th Cir. 2013)). Where a party objects and the instructions were in fact erroneous, we will affirm only if the error was "harmless beyond a reasonable doubt." *Villalobos*, 748 F.3d at 957 (citation omitted).

Koziol argues that the court erroneously instructed the jury on the meaning of "wrongful" under the Hobbs Act by not requiring the jury to find the two prongs of the sham litigation exception to the *Noerr-Pennington* doctrine. He also argues that the district court erroneously instructed the jury that the Hobbs Act criminalizes "wrongful" threats of reputational harm. Because Koziol did not object to the instructions on the first basis, we review the challenged instruction for plain error and conclude there was none. Although Koziol did object to the instructions on the second basis, we conclude that any error was harmless. Thus, we reject Koziol's instructional error arguments.

## A.

The district court instructed the jury, in relevant part, that for the defendant to be found guilty of attempted extortion in violation of 18 U.S.C. § 1951(a), the government must prove that "the defendant intended to induce [the entertainer] to part with property by wrongful threat of economic or reputational harm." The court further instructed the jury that "[a] threat is wrongful if it is unlawful or if the defendant knew he was not entitled to obtain the property."

Koziol argues the court erroneously failed to instruct the jury that, to find a threat of litigation to be "wrongful," it must find the requirements of the sham litigation exception to the *Noerr-Pennington* doctrine—i.e., that the lawsuit was (1) objectively baseless and (2) asserted with an improper motive.  He also argues that this instruction was erroneous because the district court did not define "unlawful."

Although Koziol proposed an instruction removing the term "unlawful," he did not argue that, if that term were included, the district court should define it, nor did he object that the instruction failed to require the jury to find the requirements of sham litigation.  Accordingly, we review for plain error.  *See United States v. Peterson*, 538 F.3d 1064, 1071 (9th Cir. 2008) ("A defendant's mere proposal of an alternate instruction does not satisfy Rule 30's standard of specificity." (citations omitted)).

Koziol argues that the instruction did not require the jury to find the first prong of the sham litigation exception—that his claim was objectively baseless—because it allowed the jury to find that his litigation threat was wrongful if it was "unlawful," and therefore the jury could find him guilty even if Koziol believed he had a lawful claim.  Koziol also argues that the instruction did not require that the jury find the second prong of the sham litigation exception—improper motive—because it required only that he knew he was not entitled to obtain money from the entertainer, "which is comparable to the requirement that the lawsuit be 'objectively baseless,'" but "[i]t said nothing about the additional requirement of an improper collateral purpose."

As an initial matter, we note that Koziol's arguments appear to confuse the objective and subjective prongs of the sham litigation exception.  In both arguments, Koziol asserts that whether his claim against the entertainer was

"objectively baseless" turns on whether *he knew* he had no claim against the entertainer.  Thus, Koziol appears to argue that a *subjective* standard applies to determine whether a claim is "objectively baseless."  But the Supreme Court has explained that a lawsuit is objectively baseless where "no reasonable litigant could realistically expect success on the merits." *Pro. Real Est. Invs.*, 508 U.S. at 60.  Thus, contrary to Koziol's arguments, the first prong of the sham litigation exception is determined by the objective standard of a reasonable litigant, not Koziol's subjective belief.

Nonetheless, even if we construe Koziol's argument as challenging the instruction for failing to require the jury to find that his threat was baseless under an objective standard, we conclude that he has not established plain error.  First, Koziol does not argue that the district court erred by instructing the jury that an "unlawful" threat is "wrongful" under the Hobbs Act.  *See Villalobos*, 748 F.3d at 957–58 (explaining that threats that were "unlawful" were "wrongful" under the Hobbs Act).  Second, the government argued to the jury that Koziol's threats were "wrongful" under the Act because his claims were completely fabricated and he knew he was not entitled to obtain money from the entertainer; the government did not argue that the threats themselves were unlawful.[17]  Finally, Koziol's attorney conceded in his closing argument that Koziol's claim against the entertainer was objectively baseless.[18]  Therefore, the

---

[17] For this reason, Koziol's argument that the court erred by not defining "unlawful" also fails.

[18] Koziol's attorney stated that "the government has given you enough proof for you to really believe it wasn't [the entertainer] in that room that day.  I think they have proven that beyond a reasonable doubt . . . ."  Based on the uncontroverted evidence that the entertainer was not the massage customer and was not present, no reasonable litigant could

first prong of the sham litigation exception was not at issue, there is no reasonable probability that omitting it from the instruction affected the verdict, and any error did not affect the fairness of the proceedings. *Conti*, 804 F.3d at 981–82.

Koziol's argument that the instruction did not require the jury to find the second prong of the sham litigation exception similarly fails. Koziol argues that the instruction allowed the jury to find that a threat is wrongful if the defendant "knew he was not entitled to obtain the property," but did not require the jury to find that the threat was for an improper purpose. Koziol argues that the second prong of the sham litigation exception requires more than subjective knowledge that a claim is baseless. He also argues "that a reasonable jury could not *possibly* make the required finding [that] Mr. Koziol had a collateral purpose and was indifferent to the outcome of the threatened lawsuit." But we have already rejected these arguments and concluded that because Koziol did not file his threatened lawsuit, a jury could reasonably conclude that Koziol hoped to enforce his claim "through the *threat* of litigation rather than through actual litigation," and therefore sought to achieve his "aim[s] through the litigation *process* rather than through the *result* of that process." *See Rock River Commc'ns*, 745 F.3d at 353 (citation omitted).

Moreover, the government's theory of the case, which it explicitly argued to the jury, was that Koziol never had any intention of filing a lawsuit. The government argued that Koziol made false allegations against the entertainer "because he wanted to extract an easy score, an easy payday

have realistically expected success on the merits. *See Pro. Real Est. Invs.*, 508 U.S. at 60–61. Therefore, this concession established that Koziol's claim was objectively baseless.

from someone who had much to lose, not because defendant was going to file a legitimate lawsuit" and that Koziol's allegations were "made up. It didn't happen. None of it happened. He knew it. It's not about a threat to file a lawsuit, it's completely fabricated."

Because the instruction required the jury to find that Koziol knew he was not entitled to the property, and the evidence supported the government's argument that Koziol was hoping to enforce his claims through the threat of litigation rather than the result of the litigation process, we conclude that the instruction was not misleading and it adequately guided the jury's deliberation. *See Liew*, 856 F.3d at 595–96, 598. Finally, even if the instruction were erroneous, there was strong evidence that Koziol's threatened litigation was a sham and therefore Koziol has not shown a reasonable probability that any instructional error affected the outcome of the trial. *See Conti*, 804 F.3d at 982.

**B.**

Koziol also argues that the Hobbs Act does not apply to threats of reputational harm and, therefore, the district court erred by instructing the jury that, to return a guilty verdict, it could find that Koziol "intended to induce [the entertainer] to part with property by wrongful threat of economic or reputational harm." Koziol's argument relies entirely on the reasoning of the dissent in an unpublished decision from this court, *United States v. Brank*, 724 F. App'x 527, 530–31 (9th Cir. 2018) (per curiam) (Reinhardt, J., concurring in part and dissenting in part). Koziol does not point us to any binding precedent to support his argument, and we find nothing in the plain language of the statute that requires us to conclude

that threats of reputational harm are not within the purview of the Hobbs Act.[19]

Nonetheless, we need not decide whether extortion under the Hobbs Act includes threats of reputational injury because any error in the instruction including reputational harm was harmless beyond a reasonable doubt. *See Villalobos*, 748 F.3d at 957 (explaining that a jury instruction can be found harmless "if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error" (internal quotation marks and citations omitted)). The uncontested evidence, admitted without objection, readily established that the entertainer was reasonably fearful that Koziol's allegations would damage his career, causing economic harm. To determine whether a defendant used "fear," courts look to "the reasonable state of mind of the victim." *United States v. Greger*, 716 F.2d 1275, 1278 (9th Cir. 1983) (citations omitted). "A reasonable fear" of economic loss "is clearly sufficient to support a conviction of 'extortion' under the statute." *Cape v. United States*, 283 F.2d 430, 434 (9th Cir. 1960) (citations omitted).

---

[19] In *Brank*, the majority observed that the plain language of the Hobbs Act encompasses reputational injury. 724 F. App'x at 529. Relying on *United States v. Nardello*, 393 U.S. 286 (1969), the majority concluded that the generic use of "extortion" encompasses threats to reputation. 724 F. App'x at 529. In *Nardello*, the Supreme Court was tasked with determining whether, for purposes of the Travel Act, 18 U.S.C. § 1952, the defendant's threats to expose the private relationships of third parties fell within the statute's definition of extortion. 393 U.S. at 296 (citation omitted). After examining the Travel Act's legislative history, the Court declined to give "'extortion' an unnaturally narrow reading," finding that threats to reputation fell within "the generic term." *Id.* Thus, in *Brank*, we reasoned the same scope applied to the generic term "extortion" as used in the Hobbs Act. 724 F. App'x at 529.

The entertainer testified that Koziol's allegations could damage his career and could "definitely impact [him] financially, a lot"; that he could lose corporate sponsors; that he would not be hired for certain jobs, including specific children's television programs and movies, fundraising galas (which he described as the source of "a lot of [his] income"), and performances at religious colleges and universities (where he stated he "do[es] extra well"); and that if he lost these jobs, he could not continue to employ the people who work on his performances.   This evidence sufficiently demonstrates that the entertainer had a reasonable fear of economic loss to establish the "use of fear" under the Hobbs Act.  *See Cape*, 283 F.2d at 434.

Koziol asserts that error from this instruction cannot be harmless because the government argued that the entertainer suffered both economic and reputational harm, and the evidence of economic harm was based on the entertainer's opinion without "accounting evidence show[ing] actual lost business."   But he cites no authority to suggest that the entertainer's testimony would not be sufficient to establish his fear of economic harm or that accounting evidence is necessary, particularly for a charge of attempted extortion where the threatened lawsuit was not filed and the victim did not suffer the feared economic harm.   Indeed, we have previously determined that testimony from extortion victims that they believed "serious damage would occur to [the] business if" the defendant carried out his threat was sufficient to show the use of "fear" to obtain property. *Greger*, 716 F.2d at 1278–79.

Koziol also argues that "the only evidence of potential economic harm was [the entertainer's] self[-]serving evaluation that he has an 'autobiographical' career and is a 'person who is relevant and clean.'" We reject this argument

because it understates and ignores significant record evidence that the entertainer feared economic harm based on a reasonable belief that Koziol's threatened lawsuit could damage his career by costing him jobs and other business relationships. *See Greger*, 716 F.2d at 1278–79; *Cape*, 283 F.2d at 432, 434.

We conclude that even if the district court erred by including reputational harm in the instruction, any error was harmless beyond a reasonable doubt. *See Villalobos*, 748 F.3d at 957. The uncontested evidence clearly established that Koziol's threats caused the entertainer to fear economic harm. Therefore, we reject Koziol's arguments of instructional error.

## V.

Koziol also argues that his conviction must be vacated based on evidentiary errors. Specifically, Koziol argues that the district court erred by allowing a witness—the manager's attorney, Wright—to opine on Koziol's and the manager's credibility. When a party preserves an objection to the district court's ruling on the admission of evidence, we review that ruling for abuse of discretion. *See United States v. Obendorf*, 894 F.3d 1094, 1098 (9th Cir. 2018). But even if the district court erred, we will still affirm unless the error "more likely than not affected the verdict." *Id.* (citation omitted). When an objection to an evidentiary ruling is not properly preserved, plain error review applies. *See United States v. Del Toro-Barboza*, 673 F.3d 1136, 1152 (9th Cir. 2012).

Koziol argues that Wright's statements explaining letters she wrote in response to demand letters from Sweet's attorney, Saadian, and from Koziol's attorney, Arzani, warrant reversal as improper opinion testimony. Although

he did not object to the admission of these letters, Koziol argues that the district court erred in admitting Wright's statements: (1) explaining that, in the letter responding to Saadian's demand letter, she was conveying that "the allegations that we determined to be true were that" the manager responded to Sweet's massage ad and that he was the massage customer; (2) explaining that "it was [her] understanding based on [an] investigation that there were more text messages that completed the conversation between [the manager] and Ms. Sweet," but they were not included in Saadian's demand letter; and (3) explaining that, in response to Arzani's letter, she wrote that Koziol's prior claim that the manager assaulted him was an "utter fabrication" based on "[i]nformation that [she] learned from [her] client," "information that [she] learned from [her] investigation," and her conclusion that she "inferred from the facts," that Koziol's claim "just was not plausible or credible."[20]

At trial, Koziol did not object to the first statement as improper opinion testimony and he did not make any objection to the second statement. Accordingly, Koziol failed to preserve these issues for appeal, and we review for plain error.[21]  *See Del Toro-Barboza*, 673 F.3d at 1152.

---

[20] This letter to Arzani stated: "[A]s to [the manager], I will repeat what we told your client last August when he first tried his extortion scam. His claim that [the manager] assaulted and battered him on January 10 is a complete and utter fabrication."

[21] We reject Koziol's argument that his failure to raise the proper objection does not matter for the standard of review because his objection on personal knowledge grounds "ma[d]e the point." An evidentiary issue is not preserved unless the specific objection is raised at trial. *See, e.g.*, *United States v. Sioux*, 362 F.3d 1241, 1245 n.5 (9th Cir. 2004); *see also Del Toro-Barboza*, 673 F.3d at 1152 ("[A] party fails

Koziol fails to establish plain error for either statement because they reflect Wright's understanding of the manager's version of the incident; they do not clearly or directly opine on whether the manager was telling the truth. Thus, the district court did not plainly err in allowing this testimony.

But, as the government concedes, the district court abused its discretion in overruling Koziol's objection and admitting Wright's third statement that she "inferred from the facts" that Koziol's claim that the manager assaulted him was not credible. We conclude, however, that the admission of this testimony was harmless because it was similar to and cumulative of Wright's other testimony—which was admitted without objection and not challenged on appeal— that she "was incredulous" and "thought [Koziol's claim] was not believable."[22]  *See United States v. Lindsey*, 634 F.3d 541, 553 (9th Cir. 2011) (stating that the erroneous admission of evidence was harmless because the evidence was cumulative of evidence that was not challenged on appeal).

In addition, as we have already explained, the evidence strongly supports the conclusion that Koziol lied in his claims that the entertainer assaulted him and that he knew he had no lawful claim against the entertainer. Therefore, any error in admitting Wright's third statement that she concluded that Koziol's claims against *the manager* were not

_____

to preserve an evidentiary issue for appeal not only by failing to make a specific objection, but also by making the wrong specific objection." (alteration in original) (citations omitted)).

[22] Wright also testified, without objection, that she told Koziol she "didn't believe him" because he was not mentioned in any prior correspondence regarding the incident.

credible was harmless based on the strength of the government's case charging Koziol with extorting *the entertainer*, not the manager. *See United States v. Gillam*, 167 F.3d 1273, 1277 (9th Cir. 1999); *United States v. Wang*, 49 F.3d 502, 504 (9th Cir. 1995).

Finally, the district court remedied any error by giving a limiting instruction that Wright's testimony was "offered only to explain why she did what she did" and did not "control[]" the jury's decision of guilt. *See United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (concluding that limiting instruction mitigated any "resultant prejudice" from admitted evidence and noting that "we must presume that juries will follow the district court's limiting instructions"). Koziol, however, argues that the limiting instruction was inadequate because the court stated that Wright's statements had some probative value. But Wright's testimony that she told Koziol that his claims were baseless, and why, was relevant to whether Koziol ever knew that his threatened litigation was a baseless sham. Therefore, we conclude that the district court's admission of Wright's third statement constitutes harmless error. *See, e.g.*, *United States v. Arambula-Ruiz*, 987 F.2d 599, 605 (9th Cir. 1993) (holding error in admitting evidence was "harmless because it is not probable that the evidence *materially* affected the jurors' verdict").

## VI.

Finally, Koziol argues that the district court erred at sentencing by misapplying the Sentencing Guidelines and by failing to recognize its discretion to order that his sentence run concurrently to his sentence for a prior conviction in state court for pimping and pandering. Koziol argues that these errors require that we vacate his sentence.

We review the district court's sentencing decision for abuse of discretion. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). If the district court improperly calculates the Guidelines range or bases its decision on clearly erroneous facts, it abuses its discretion. *Id.* We review for plain error when a defendant fails to object to the district court's implementation of the Guidelines. *See United States v. Lloyd*, 807 F.3d 1128, 1139 (9th Cir. 2015).

## A.

The district court sentenced Koziol to seventy months' imprisonment, concluding that his total offense level was twenty-three and he was in criminal history category IV. To calculate the Guidelines range, the district court applied Guidelines § 2B3.3, "Blackmail and Similar Forms of Extortion," which provides a base offense level of nine. U.S.S.G. § 2B3.3(a). This section also provides for increases in the base offense level based on "the amount obtained or demanded," with the specific increases set out in § 2B1.1. *Id.* § 2B3.3(b)(1). If the amount obtained or demanded exceeds $550,000, but is $1,500,000 or less, a fourteen-level increase applies. *Id.* § 2B1.1(b)(1)(H)–(I). Because Koziol demanded $1,000,000 from the entertainer, the district court added fourteen levels to the base offense level. Thus, the district court concluded that Koziol's total offense level was twenty-three, which resulted in a guidelines imprisonment range of seventy to eighty-seven months. The district court sentenced Koziol to the low end of that range.

Koziol argues that the district court erred by applying the fourteen-level increase in § 2B1.1 because his initial settlement demand of $1,000,000 was intended to start negotiations and therefore cannot be considered the true

amount "demanded" for purposes of § 2B3.3(b).[23]    He argues that "people involved in litigation know the initial 'demand' is not the real demand."    Thus, he contends, without citation to authority, that a district court must "make a finding . . . about what the defendant's intended demand was."

But § 2B3.3 does not instruct courts to determine the defendant's intended demand, and instead provides for increases in the offense level based on the amount "obtained or demanded."  *See United States v. Zhuang*, 270 F.3d 107, 108–09 (2d Cir. 2001) (rejecting argument that an increase in offense level under § 2B3.3 should depend on the defendant's intent or ability to receive the amount demanded and affirming sentence enhancement based on initial $68,000 demand even though the defendant later reduced the demand to $10,000).  It is undisputed that Koziol demanded $1,000,000 from the entertainer.  Therefore, the district court did not err by applying the specific offense characteristics in § 2B1.1(b)(1)(H) and increasing Koziol's base offense level by fourteen points.

## B.

Koziol also argues that the district court erred by failing to apply Guidelines § 2X1.1, which provides offense guidelines for attempt, solicitation, and conspiracy when these offenses are not otherwise covered by a specific offense guideline.  Section 2X1.1(b)(1) provides that the district court shall decrease the offense level by three for an

---

[23] In his demands, Koziol stated he would be open to a "structured settlement," but he did not argue before us that the district court erred by not considering the possibility that the value of any "structured settlement" would be below the $550,000 threshold of § 2B1.1(b)(1)(H).

attempted offense, "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control."[24]   In other words, a defendant is entitled to the reduction unless "the remaining steps to be taken in the commission of a crime are so insubstantial that the commission of the substantive offense is inevitable." *United States v. Martinez-Martinez*, 156 F.3d 936, 939 (9th Cir. 1998).

Because Koziol did not raise this argument during sentencing, we review for plain error. *See Lloyd*, 807 F.3d at 1139. To establish plain error in sentencing, Koziol "must 'demonstrate a reasonable probability that [he] would have received a different sentence if the district court had not erred.'" *See United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013) (alteration in original) (quoting *United States v. Tapia*, 665 F.3d 1059, 1061 (9th Cir. 2011)).   "A 'reasonable probability' is, of course, less than a certainty, or even a likelihood." *Id.* (citation omitted).  Plain error "seriously affects the fairness, integrity, or public reputation of judicial proceedings" where it "may have increased the length of a defendant's sentence." *Id.* (citations omitted).

The government concedes that the district court erred by failing to apply § 2X1.1, which applies by default because § 2B3.3 does not expressly apply to attempted extortion, but it argues that the court did not plainly err because Koziol

---

[24] Under § 2X1.1(a), the court applies "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."

would not have been entitled to a reduction under this provision. We reject the government's argument and conclude that this conceded error was plain. *See United States v. Simon*, 858 F.3d 1289, 1298 (9th Cir. 2017) (en banc) (holding that a Guidelines section expressly covers an inchoate offense "only if the Guidelines themselves so indicate"); *Joseph*, 716 F.3d at 1280 (explaining that an error is plain if it is clearly "contrary to the law at the time of appeal" (citation omitted)).

The government, however, contends that it "would not have been clearly erroneous for the district court to find that defendant completed all the acts he believed necessary for a successful completion of the crime of extortion." But the district court did not consider § 2X1.1 and did not make such findings. There is at least a reasonable probability that the district court would have imposed a three-level reduction had it imposed the correct Sentencing Guideline. Therefore, this error, which may have increased Koziol's sentence, affected Koziol's substantial rights and the integrity of the judicial proceedings. *See Joseph*, 716 F.3d at 1280. We vacate the sentence and remand for resentencing.

## C.

Finally, Koziol asserts that the district court erred in failing to recognize that it had discretion to impose a sentence to run concurrent with the sentence imposed for Koziol's conviction in state court. The government responds that the district court understood that it had authority under 18 U.S.C. § 3584(a) to impose a concurrent sentence but "did not believe a concurrent sentence was appropriate." We need not address this issue as we have already determined that there was reversible error requiring resentencing. On remand, the district court can determine if a concurrent sentence is appropriate under 18 U.S.C. § 3584(a). *See*

*United States v. Montes-Ruiz*, 745 F.3d 1286, 1293 (9th Cir. 2014); *United States v. Ponce*, 51 F.3d 820, 826 (9th Cir. 1995).

## VII.

The Hobbs Act imposes criminal liability for extortion on those who obtain property from another by the "wrongful use of . . . fear." 18 U.S.C. § 1951(a), (b)(2). We conclude that there is no statutory, constitutional, or policy basis to exclude categorically threats of sham litigation from liability under the Hobbs Act. Instead, we must consider the circumstances of such threats to determine if the means used were "wrongful" under the Act, or if the ends were "wrongful" because the defendant sought property to which he knew he had no lawful claim. We hold that Koziol's threats of sham litigation were wrongful because sufficient evidence supported the jury's verdict that he sought property to which he knew he had no lawful claim, and we affirm his conviction for attempted extortion under the Hobbs Act. We also reject Koziol's arguments of instructional and evidentiary error. However, because we conclude that there was plain error at sentencing, we vacate Koziol's sentence and remand for further proceedings consistent with this opinion.

**Conviction AFFIRMED; Sentence VACATED and REMANDED for resentencing.**